A.O. SMITH CORPORATION, a Delaware corporation, A.O. Smith Harvestore Products, Inc., a Delaware corporation, Agristor Credit Corporation, a Delaware corporation and Agristor Leasing, a Wisconsin partnership, Plaintiffs-Respondents,†

v.

ALLSTATE INSURANCE COMPANIES, an Illinois corporation, Defendant-Appellant,

CONTINENTAL CASUALTY COMPANY, a Delaware corporation, Defendant-Co-Appellant,

WAUSAU INSURANCE COMPANIES, a Wisconsin corporation, Defendant.

Court of Appeals

*No. 96–3496. Oral argument July 8, 1998.—Decided October 20, 1998.*

(Also reported in 588 N.W.2d 285.)

†Petition to review denied.

476

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph D. McDevitt* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee, *Mitchell S. Goldgehn* and *James A. Smith* of *Aronberg, Goldgehn, Davis & Garmisa*, of counsel, of Chicago, IL and *Stephen M. Compton* of *Brennan, Steil, Basting &*

*MacDougall, S.C.* of Janesville. There was oral argument by *Stephen M. Compton*.

On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *Donald M. Lieb* and *Paul J. Pytlik* of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.* of Milwaukee and *Terry M. Cosgrove* and *Arthur J. McColgan*, of counsel, of Chicago, IL. There was oral argument by *Terry M. Cosgrove*.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Scott W. Hansen* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee, and *J.W. Montgomery III* and *Curt Vazquez* of *Jones, Day, Reavis & Pogue* of Pittsburgh, PA. There was oral argument by *J. W. Montgomery III*. *Professor Kenneth S. Abraham* of Charlottesville, VA also participated on behalf of plaintiffs-respondents.

Before Wedemeyer, P.J., Schudson and Myse, JJ.

WEDEMEYER, P.J.    Allstate Insurance Companies and Continental Casualty Company appeal from an order granting summary judgment in favor of A.O. Smith Corporation and its subsidiary, A.O. Smith Harvestore Products, Inc.[1] The trial court granted Smith's motion seeking indemnification for defense costs and indemnification for underlying settlements, ruling that claims of fraud, conspiracy to defraud, and mail fraud alleged in several complaints against Smith were covered occurrences, triggering a duty to defend and a duty to indemnify. Allstate contends that the trial court erred in assuming that fraud, conspiracy to

---

[1] A.O. Smith and its subsidiary, A.O. Smith Harvestore Products, Inc., will be referred to collectively as Smith. Both were involved in manufacturing the Harvestore structure at issue here and both are insured under the policies at issue here.

defraud, and mail fraud are covered "occurrences."[2] Continental argues that the fraud claims do not state facts which constitute an "occurrence" under its policy and the trial court erred in concluding that Wisconsin law should be applied. Because fraud claims do not constitute an occurrence under the policies at issue here, we reverse and remand with directions. Continental also challenges the trial court's conflicts of law determination that Wisconsin, rather than Illinois, insurance law applies. Because there is no actual conflict between the laws of these two states regarding the coverage issues, we reject Continental's assertion and apply Wisconsin law. This case also presents a novel issue regarding a party raising an argument during oral argument that it failed to raise in its appellate brief. In addressing this issue, we conclude that when a party does not brief an argument in its appeal brief, the party is precluded from presenting that argument for the first time on appeal at the oral argument.

## I.  BACKGROUND

This case arises from three lawsuits in which Smith was sued for fraudulently representing that its Harvestore feed storage silos provided special oxygen limiting capabilities. The lawsuits alleged that the feed

---

[2] Specifically, Allstate contends that the trial court should have addressed whether the allegations in the complaint constitute "accidents" before proceeding to a discussion of whether the "expected and intended" language of the definition of occurrence precludes coverage. Because we conclude that the allegations in the complaints do not state facts which constitute an occurrence, we decline to address Allstate's specific contention regarding the definition of accidental conduct. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issues need be addressed).

stored in the Harvestores was damaged by excessive exposure to oxygen, which caused mold growth and damaged the feed. As a result, dairy cattle that fed on the damaged feed suffered increased veterinary problems and reduced milk production.

The lawsuits underlying this appeal were filed by Telois Miles, Walter, Barbara and Greg Mohr, and Arthur and Molly Thiss. The Mohr and Thiss complaints were filed in Michigan. The Miles case was filed in Arkansas.

Miles claimed that she and her late husband had purchased and installed two Harvestore structures on their farm. The first structure was installed in 1973, and the second in 1981. She alleged that following the installation, rotten and moldy feed adversely affected their cattle herd. The Miles complaint alleged that Smith committed fraud and conspiracy to commit fraud by overstating the capabilities of the Harvestore structures. Smith was able to secure a dismissal of the Miles complaint on statute of limitations grounds.

The Mohrs leased two Harvestore structures that were installed in September 1979. When they were sued for breach of the lease agreement, the Mohrs counterclaimed against Smith alleging that the Harvestores caused feed to spoil resulting in harm to their cattle. The counterclaim pled causes of action for fraud, conspiracy to commit fraud, innocent misrepresentation and violations under 18 U.S.C. § 1962(a) & (c) of the RICO act. Smith filed a motion to dismiss the counterclaim. In January 1991, the court dismissed all but the fraud, conspiracy to commit fraud, and RICO mail fraud allegations. The fraud claims alleged that, contrary to Smith's representations, the Harvestores did not limit the amount of oxygen to which stored feed was exposed, causing the feed to spoil, which, in turn,

caused loss of milk production, decreased number of offspring, and increased labor costs. Continental indemnified Smith for its defense costs on this claim until March 1992, when Continental informed Smith it would no longer continue to indemnify Smith for defense expenses. Continental's basis for this change was that the only remaining claims involved fraud actions, which were not covered by its policy. Smith settled the Mohrs claim for $1,855,000 in October 1993.

The Thisses sued Smith over the two Harvestore structures they had purchased, the first in 1977, and the second in October 1980. The complaint alleged fraud, conspiracy to commit fraud, and violations of the RICO act under 18 U.S.C. § 1962(a) & (c). The Thisses alleged that the feed fed from the Harvestore system was damaged because of exposure to oxygen. As a result, they alleged their dairy herd was nutritionally compromised, experienced lower milk production, breeding problems, general malaise, and higher than normal cull rates. Smith settled this claim in 1993.

In July 1991, Smith sued Allstate, Continental and Wausau seeking to recover judgments, settlements, and defense costs incurred in fifteen underlying claims involving Harvestore lawsuits. Only three of those claims are at issue in this appeal. The underlying complaints at issue in this appeal alleged in pertinent part:[3]

> [Count I: Fraud] . . . representations made by [Smith] to plaintiffs in . . . sales literature and through [the sales agent] regarding the Harvestore

---

[3] The language excerpted here comes from the Thiss complaint. Because the three complaints are substantially similar, we will not recite the language of each, but rather, will rely on the language here as a representative sampling.

system, how it operates and the impact its operation would have on plaintiffs' farm performance were material to plaintiffs' decision to purchase the Harvestore system.

48. These written and oral representations were false in that:

(a) The Harvestore System was not "oxygen limiting" in that it did not protect the feed stored within it from oxygen during normal operation.

(b) The feed fed from the Harvestore system was damaged because of exposure to oxygen nutritionally compromising plaintiffs' herd and as a result insidiously and adversely affecting its productivity and health.

(c) The decreased production and increased costs associated with installing and using the Harvestore system all but destroyed plaintiffs' farm operation.

49. Through its conduct, [Smith] assisted, instigated and participated in the false representations made by [the sales agent] to the plaintiffs.

50. [Smith] knew the representations it was making to plaintiffs through [the sales agent] were false or made recklessly, without any knowledge of the truth of these representations.

51. [Smith] made these representations through [the sales agent] as part of their overall marketing program and intended that plaintiffs rely on these representations.

52. Plaintiffs relied on the representations of [Smith] in purchasing the Harvestore system.

53. As a direct and proximate result of [Smith's] misrepresentations, plaintiffs have suffered severe economic and non-economic damages.

54. [Smith's] conduct was voluntary, malicious and so willful and wanton as to demonstrate a reckless disregard of plaintiffs' rights, and that conduct inspired in plaintiffs feelings of humiliation, outrage, indignity, emotional distress and mental anguish.

. . . .

[Count III: Conspiracy to Commit Fraud] . . .

69. During all times relevant to this matter, AOS has been directly involved in the research, development and marketing of the Harvestore system such as the one purchased by plaintiffs, including approval of the content of the sales literature utilized by AOSHPI and its dealers which contained representations that the Harvestore system was "oxygen limiting" and prevented oxygen from coming in contact with the feed during normal operations.

70. Since at least 1965 through 1986, AOS and AOSHPI conducted, participated in and/or were aware of research and development studies which demonstrated that the representations AOSHPI was making through its dealers to prospective purchasers about the Harvestore system, how it operated and the impact its operation would have on plaintiffs' farm performance, such as the representations made by [the sales agent] to plaintiffs, were false.

71. AOS in concert with AOSHPI decided not to disclose the findings of these research and development studies to prior or prospective purchasers of the Harvestore system.

72. AOS in concert with AOSHPI continued making representations to prospective purchasers of the Harvestore system, such as those representations made by [the sales agent] to plaintiffs, which AOS and AOSHPI knew were false.

73. The actions taken by AOS in concert with AOSHPI to conceal information regarding the falsity of the representations being made to prospective purchasers about the Harvestore system, directly resulted in the false representations made to plaintiffs.

74. These representations concerning the Harvestore system, how it operated, and the impact its operation would have on plaintiffs' farm performance were material to plaintiffs' decision to purchase the Harvestore system.

. . . .

76. AOS and AOSHPI knew the representations being made were false, or understood that they were being made recklessly without any knowledge of the truth of these representations.

77. AOS and AOSHPI, in concert, allowed these representations to be made as part of their overall marketing program and intended that plaintiffs rely on these representations.

78. Plaintiffs relied on these representations in purchasing the Harvestore system.

79. As a direct and proximate result of these misrepresentations, plaintiffs have suffered severe economic and non-economic damages.

80. AOS' and AOSHPI's conduct was voluntary, malicious and so willful and wanton as to demonstrate a reckless disregard of plaintiffs' rights, and that conduct inspired in plaintiffs feelings of humiliation, outrage, indignity, emotional distress and mental anguish.

. . . .

[Count IV: RICO 1962(c)] . . .

82. In connection with the representations made by [Smith] to plaintiffs prior to and after the sale of the Harvestore system to plaintiffs, [the sales agent and Smith] used the mails or caused the mails to be used on at least twenty-five (25) occa-

sions between June 1973 and June 1986 to transmit: . . . [certain documents].

83. Each of these transmittals by mail related to:

(a) Materials that were used to execute or further carrying out the fraudulent representations made to plaintiffs and farmers throughout the country by [Smith]; or

(b) Materials that demonstrated the falsity of the representations made by [Smith] to plaintiffs and farmers throughout the country.

84. Each use by [the sales agent and Smith] of the United States mails to transmit this information constituted an act of mail fraud within the meaning of 18 U.S.C. § 1961(1)(B).

All coverage issues not involving fraud claims have been resolved by the parties. In April 1992, Smith filed a motion seeking partial summary judgment on the three claims at issue in this appeal: Miles, Mohr and Thiss. Smith's written motion sought only reimbursement of defense costs.

The trial court conducted a hearing on this motion on June 13, 1994. At the hearing, in addition to the defense costs referenced in its motion papers, Smith also requested that the trial court order the insurers to indemnify it for the settlements reached in the Mohr and Thiss actions. On April 12, 1995, the trial court issued a written decision granting Smith's summary judgment motion, ruling that the allegations in the complaint stated facts which were within the scope of coverage as "occurrences" under both insurance policies at issue. The trial court ruled that, although the complaints alleged an intentional act, they did not also

allege an intent to injure, which is required in order to exclude coverage. A written order was entered on November 26, 1996.

Allstate and Continental petitioned this court for interlocutory review of that order. We granted the petition in March 1997.

## II. DISCUSSION

### A. *Standard of Review.*

This case comes to us following a partial grant of summary judgment. The rubrics for reviewing a grant of summary judgment are well known and need not be repeated here. *See* § 802.08, STATS. Our review is *de novo*. *See M&I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 195 Wis. 2d 485, 496–97, 536 N.W.2d 175, 182 (Ct. App. 1995). Moreover, interpretation of an insurance contract also involves this court's independent review. *See Smith v. State Farm Fire & Cas. Co.*, 192 Wis. 2d 322, 328–29, 531 N.W.2d 376, 379 (Ct. App. 1995). We also note that insurance policies are construed to give their language "its common and ordinary meaning" as that language "would be understood by a reasonable person in the position of the insured." *Id.* at 329, 531 N.W.2d at 379.

### B. *Pertinent Portions of Insurance Policies.*

The relevant Allstate policy language provided:[4]

---

[4] Although we refer solely to the insurance policies of Allstate and Continental, the insurance history is actually a bit more complicated. Northbrook Excess & Surplus Insurance Company issued an excess umbrella liability insurance policy to Smith. Allstate, however, succeeded Northbrook's interest

## 1. COVERAGE

In consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to pay on behalf of the insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability

(a)   imposed upon the insured by law or

(b)   assumed under contract or agreement by the insured, arising out of personal injury, property damage or advertising liability caused by an occurrence.

. . . .

## OCCURRENCE

Means an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising

---

when Northbrook merged with Allstate on January 1, 1985. We refer to Allstate throughout this opinion. Immediately underlying the Allstate policy was an excess liability policy issued by Integrity Insurance Company. Integrity is not involved in this appeal and did not cover any of the claims at issue because it was insolvent. Smith also had a primary liability policy through Employers Insurance of Wausau, but Wausau is not involved in this appeal because the policy limits were exhausted by payment of claims.

The insurance policy at issue here was Northbrook Policy No. 63 006 714, with effective dates of 5/1/80 to 5/1/81. It was in excess of a lead umbrella policy furnished by Integrity Insurance Company. The Northbrook policy was a "follow form" policy, which means that it incorporated the terms and provisions of an underlying policy, to the extent that they were not inconsistent with its own terms and provisions. *See Home Ins. Co. v. American Home Prods. Corp.*, 902 F.2d 1111, 1113 (2d Cir. 1990). Therefore, the language quoted within the text of this opinion actually comes from the Integrity policy.

liability neither expected nor intended from the standpoint of the insured.

The policy also provided:

4.  DEFENSE PROVISIONS

    (a)  The company shall not be called upon to assume charge of the investigation, settlement or defense of any claim made, or suit brought, or proceedings instituted against the insured, but shall have the right and be given the opportunity to be associated in the defense and trial of any such claims, suits or proceedings relative to any occurrence which, in the opinion of the Company, may create liability on the part of the Company under the terms of this policy. If the Company avails itself of such right and opportunity the Company shall do so at its own expense. Court costs and interest if incurred with the consent of the Company, shall be borne by the Company and other interested parties in the proportion that each party's share of ultimate net loss bears to the total amount of ultimate net loss sustained by all interested parties. The provisions of this paragraph apply in all circumstances except as provided for in paragraph (b) below.

    (b)  With respect to any occurrence not covered by the underlying policies listed in the schedule of underlying insurance, or any other underlying insurance collectible by the insured, but covered by the terms and condi-

488

tions of this policy the Company shall in addition to the amount of ultimate net loss payable;

(1)  defend any suit against the insured seeking damages on account of personal injury, property damage or advertising liability, even if any of the allegations of the suit are groundless, false or fraudulent; and may make such investigation and settlement of any claim or suit as it deems expedient.

Continental's policy provides in pertinent part:[5]

## DEFENSE COVERAGE ENDORSEMENT

In consideration of the premium set forth herein, it is agreed that Coverage A of this policy is extended to include the following:

1.  In the event of the cessation of the obligation of all underlying insurers either to investigate and defend the insured or to indemnify the insured or to pay on behalf of the insured the costs and expenses of investigating and defending the insured, then the company shall either

(a)  assume the duty of investigating and defending the insured against suits

---

[5] Continental also issued an umbrella excess liability policy to Smith, effective from May 1, 1979, to May 1, 1980. Wausau served as the primary policy underlying the Continental policy that was exhausted.

489

seeking damages otherwise covered under this policy, or

(b) indemnify the insured for the reasonable costs and expenses of investigating and defending suits seeking damages otherwise covered under this policy,

whichever the company may elect.

## DEFINITIONS

. . . .

"occurrence" means

(1) with respect to subsection (1) of the definition of **personal injury** and with respect to **property damage**, an accident, including injurious exposure to conditions, which results, during this policy period, in such **personal injury**, or **property damage** neither expected nor intended from the standpoint of the insured. All **ultimate net loss** arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one **occurrence.**

*C. Waiver / Abandonment Analysis.*

Oral argument in this case was ordered and took place on May 8, 1998. This court was interested in hearing additional argument regarding whether the allegations asserting a fraud claim stated facts that constitute an occurrence and whether a n intent to injure may be inferred, as a matter of law, when a complaint contains an allegation of fraud. Counsel for Allstate and Continental addressed these issues. Counsel for Smith, however, presented an oral argument, which was a surprise both to this court and opposing

counsel. Smith argued that notwithstanding whether an intent to injure may be inferred as a matter of law, the issue was whether the alternative "reckless misrepresentation" claims are covered occurrences. Smith argued that when a statement is made recklessly, an intent to injure cannot be inferred as a matter of law and, therefore, this allegation states facts that constitute an occurrence. This argument, although presented to the trial court, was not presented in Smith's appellate brief.

The issue of whether Smith's decision not to brief this issue, but to raise it at oral argument, may in the discretion of this court, constitute waiver or abandonment of that argument, presents a question that has not been specifically addressed by our courts. In determining whether Smith has waived or abandoned the "reckless misrepresentation" argument, we are guided by numerous decisions and well-known rules of law. In analyzing this body of law, we conclude that a party may be precluded from raising an issue at oral argument that was not presented in its appeal brief.[6]

First, an issue raised in the trial court, but not raised on appeal, is deemed abandoned. *See Tatur v. Solsrud*, 167 Wis. 2d 266, 269, 481 N.W.2d 657, 658 (Ct. App. 1992) (citing *Young v. Young*, 124 Wis. 2d 306, 317, 369 N.W.2d 178, 182 (Ct. App. 1985)), *aff'd*, 174 Wis. 2d 735, 498 N.W.2d 232 (1993). Although the rule as stated speaks generally about issues not "raised on appeal," in practice, this equates to issues not raised in the appeal brief, as the majority of cases presented to

---

[6] This conclusion shall be limited to issues that are known to the parties prior to submission of their briefs. It would be unreasonable to preclude a party from presenting this court with pertinent new case law decided post-briefing, but before oral argument.

the court of appeals do not necessitate oral argument. *See* § 809.22, STATS. Moreover, a party does not know at the time briefs are prepared whether oral argument will be ordered on the case. Hence, we interpret this well-known rule of law to mean that in order for a party to have an issue considered by this court, it must be raised and argued within its brief.

Also of guidance are our numerous decisions holding that an issue raised on appeal, but not briefed or argued, is deemed abandoned. *See, e.g., Reiman Assocs., Inc. v. R/A Advertising, Inc.*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981). These decisions stand for the proposition that a party has to adequately, and with some prominence, argue an issue in order for this court to decide it. It is insufficient to just state an issue on appeal without providing support for the position and providing legal authority supporting the position. *See State v. Shaffer*, 96 Wis. 2d 531, 545–46, 292 N.W.2d 370, 378 (Ct. App. 1980).

Finally, allowing a party to raise an issue at oral argument that was not raised in its main brief is analogous to allowing an appellant to raise an issue for the first time in its reply brief. Such is not allowed. *See In re Estate of Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508, 512 n.2 (1981). The grounds for such a rule are fundamental fairness. It is inherently unfair for an appellant to withhold an argument from its main brief and argue it in its reply brief because such conduct would prevent any response from the opposing party. The same holds true for allowing a party to raise an issue at oral argument that was not briefed. It prevents the opposing party from having an adequate opportunity to respond.

In researching this issue, we were able to locate only a single case addressing this issue, *City of Mil-*

*waukee v. Christopher*, 45 Wis. 2d 188, 190, 172 N.W.2d 695, 696 (1969). In *Christopher,* our supreme court held that when an issue was not raised until oral argument, it was deemed waived. *See id.,* 45 Wis. 2d at 190, 172 N.W.2d at 696. The issue involved challenging the timeliness of the appeal. *See id.* Thus, this case is slightly different from the instant case because it did not involve the additional fact that the issue was presented to the trial court.

Nonetheless, based on the existing case law and the principles espoused above, we conclude that when a party fails to argue an issue in its main appeal brief, the appellate court may treat the issue as having been abandoned, even though the issue was presented to the trial court. We conclude that Smith abandoned the "reckless misrepresentation" issue by failing to present this argument in its appeal brief.

We underscore that waiver is a rule of administration only. There may be an occasion where the appellate court may choose to decide an issue not raised in the briefs, but raised at oral argument. If the court is of the opinion that the issue was fairly debated at oral argument such that fundamental fairness was not violated, the court may choose to address the issue. The court decides in each individual case whether the situation warrants relief from the waiver rule. Here, we are convinced that relief is not warranted.

Although we dismiss this argument as abandoned, addressing the issue on the merits would not alter the disposition of this appeal.[7] Misrepresentation claims fall into three categories in this state: (1) intentional

---

[7] The author of this opinion takes exception with that portion of the concurring opinion criticizing the majority for addressing the merits of this issue. The record speaks for itself.

misrepresentation; (2) strict responsibility misrepresentation; and (3) negligent misrepresentation. *See* WIS J I—CIVIL 2400. The reckless misrepresentation allegations asserted in the complaints at issue here are not pled as a separate cause of action, but rather are included within the intentional misrepresentation claim. The alternative "reckless misrepresentation" references that Smith relies on are nothing more than a pleading of the third element of a claim for intentional misrepresentation, which requires that the "untrue representation was made by [defendant] knowing the representation was untrue or recklessly without caring whether it was true or false." *See* WIS J I—CIVIL 2401; *Household Fin. Corp. v. Christian*, 8 Wis. 2d 53, 55–56, 98 N.W.2d 390, 392–93 (1959). Therefore, the reckless misrepresentation allegations in the complaints at issue here are the legal equivalent to, and a part of, the intentional misrepresentation claim. The "alternative" assertion in the complaint alleging that Smith made the statements recklessly, without regard to whether such were true, does not transform the intentional fraud allegations into something less. There is no negligent misrepresentation claim. The "alternative" allegations are not alternative allegations, but rather, part and parcel of the intentional fraud claim. Our analysis on the coverage issue, therefore, will focus solely on whether the fraud allegations state facts which constitute a covered occurrence and we will not concern ourselves with Smith's assertion that the "recklessly made" statements somehow reduce the complaint in part to something less than intentional fraud.[8]

---

[8] We emphasize that this decision is limited to intentional fraud cases. This opinion should not be construed to control cases that do not involve intentional fraud allegations because

## D. Conflicts of Law Analysis.

Continental argues that the trial court erred in concluding that Wisconsin insurance law should govern the interpretation of the insurance contracts.[9] Continental argues that a choice of law analysis reveals that Illinois insurance law should apply and that, under Illinois law, there is no coverage. The trial court reasoned that Wisconsin's interest in having its laws applied to insurance issues involving resident policyholders, and the desirability of uniformity in insurance policy interpretations, mandated the application of Wisconsin law.

■

Based on our decision that, under Wisconsin insurance law, the allegations contained in the complaints do not trigger coverage, there is no actual conflict between the law of Wisconsin and Illinois. Because any differences in the law between these two states are not "outcome-determinative," it is not necessary to engage in a conflicts of law analysis. *See Henderson v. State Farm Mut. Auto. Ins. Co.*, 59 Wis. 2d 451, 454, 208 N.W.2d 423, 424 (1973); *Gavers v. Federal Life Ins. Co.*, 118 Wis. 2d 113, 115–16, 345 N.W.2d 900, 901–02 (Ct.

---

the term reckless can be interpreted differently when placed into another context, such as a cause of action involving an automobile accident. *See Becker v. State Farm Mut. Auto. Ins. Co.*, 220 Wis. 2d 321, 326, 582 N.W.2d 499, 501 (Ct. App. 1998). ("Unlike injuries caused by the intentional acts of murder and sexual assault, we believe that insurance coverage for injuries caused by reckless driving is within the reasonable expectations of the contracting parties to an insurance contract.")

[9] Allstate declined to raise the choice of law issue in this appeal.

App. 1984). Therefore, the law of the forum state, Wisconsin, applies.

### E.  *Occurrence Analysis.*

The dispositive question in this case is whether allegations of intentional fraudulent acts set forth facts which constitute an occurrence, as that term is defined in the Comprehensive General Liability (CGL) policies at issue. The trial court determined that the fraud allegations did state facts that constitute an occurrence because the underlying complaints failed to specifically allege that Smith's fraudulent conduct was done with an intent to injure. In doing so, the trial court relied on case law setting forth a two-part test that must be satisfied before the "expected and intended" language of the coverage grant will apply: (1) the conduct must be an intentional act; and (2) the actor must intend to harm or injure. *See Raby v. Moe,* 153 Wis. 2d 101, 110, 450 N.W.2d 452, 455 (1990).[10] Because the second requirement of this two-part test was not alleged in the complaints and the trial court ruled intent to harm could not be inferred as a matter of law, it found that the complaints triggered a duty to defend. We disagree with the trial court's determinations. We conclude that intent can be inferred as a matter of law from the fraudulent allegations contained in the complaints.

[10] Some of the cases relied on in this opinion actually address a specific intentional acts exclusion, and set forth the two-part test to determine whether the intentional acts exclusion applies. The instant case, however, does not involve a typical intentional acts exclusion. Rather, the "expected and intended" language is actually found within the definition of an "occurrence," within the coverage grant. Nonetheless, the same two-part test applies to determine whether the "expected and intended" language operates to preclude coverage.

Thus, the allegations in the complaint do not state facts that constitute an occurrence. Accordingly, we reverse the order granting summary judgment entered in Smith's favor and remand this case to the trial court so that summary judgment may be entered in favor of Allstate and Continental.

Our analysis begins with an examination of the two factors required before the "expected or intended" language of the coverage grant will operate to preclude coverage: (1) whether the allegations pled an intentional act; and (2) whether the insured intended or expected some injury or harm to follow from that act.

The allegations in the complaints underlying this coverage case set forth causes of action for fraud, conspiracy to commit fraud, and mail fraud under RICO. As noted above, the allegations regarding the "fraud" cause of action specifically contend that Smith made "false representations" regarding the capabilities of its Harvestore silos, that Smith intended for the plaintiffs to rely on the false representations, and that Smith's "conduct was voluntary, malicious and so willful and wanton." These allegations state facts that constitute an intentional act.

With regard to the conspiracy to commit fraud, the complaint alleged that since 1965, Smith "conducted, participated in and/or were [sic] aware of research and development studies which demonstrated that the representations . . . regarding the Harvestore system . . . were false;" and "in concert . . . decided not to disclose the findings of these research and development studies to prior or prospective purchasers of the Harvestore system." The complaint also alleged that Smith "continued making representations to prospective purchasers of the Harvestore system . . . which [Smith] knew were false;" and such "conduct was voluntary,

malicious and so willful." Such conduct constitutes intentional acts.

Finally, the RICO allegations contended that Smith used the mail to transmit certain documents that Smith knew contained false representations regarding the Harvestore silos. Again, these allegations state facts which constitute an intentional act. Therefore, the first requirement for application of the "expected or intended" portion of the coverage grant is satisfied and we now address whether Smith intended injury or harm in allegedly committing these intentional acts.

The face of the complaints does not specifically allege an intent to injure and the insurers do not attempt to argue otherwise. Rather, the focus is on whether an intent to injure may be inferred as a matter of law based on the fraud allegations. Generally, when an intent to injure is not specifically pled, this is a factual issue that should be presented to a jury. *See Raby*, 153 Wis. 2d at 112, 450 N.W.2d at 456 (whether an insured intended injury or harm from his or her intentional act is a question of fact).

There are certain circumstances, however, when courts have inferred intent to injure, as a matter of law. In Wisconsin, these include sexual molestation of a child, *see K.A.G. v. Stanford*, 148 Wis. 2d 158, 164, 434 N.W.2d 790, 793 (Ct. App. 1988), and armed robbery, *see Raby*, 153 Wis. 2d at 113, 450 N.W.2d at 456. *Cf. Loveridge v. Chartier*, 161 Wis. 2d 150, 189, 468 N.W.2d 146, 159 (1991) (intent to injure may not be inferred as a matter of law when an adult engages in a consensual sexual relationship with a sixteen-year-old minor). The crucial question in determining when intent to injure may be inferred as a matter of law, or

when this issue involves a factual question for the jury to decide, is whether the conduct alleged is of such a nature that injury or harm is substantially certain to result. *See K.A.G.*, 148 Wis. 2d at 163, 434 N.W.2d at 792. There must be a "degree of certainty that the conduct will cause injury . . . sufficiently great to justify inferring intent to injure as a matter of law." *Id.*

We determine today whether intentional fraud is so substantially certain to result in harm or injury as to justify inferring intent to injure as a matter of law. In making this determination, we are guided by the reasoning espoused in cases that have inferred intent as a matter of law from intentional conduct. In *K.A.G.*, we reasoned that "the more likely harm is to result from certain intentional conduct, the more likely intent to harm may be inferred as a matter of law," *K.A.G.*, 148 Wis. 2d at 165, 434 N.W.2d at 793, and " 'where a reasonable [person] in the defendant's position would believe that a particular result was substantially certain to follow, he will be dealt with . . . as though he had intended it.' " *Id.* at 162–63, 434 N.W.2d at 792 (citation omitted). Further, it is "well established that a person is presumed to intend 'the natural and probable consequences of his acts voluntarily and knowingly performed.' " *Haessly v. Germantown Mut. Ins. Co.*, 213 Wis. 2d 108, 118, 569 N.W.2d 804, 808 (Ct. App. 1997) (citation omitted).

In considering these principles under the circumstances presented here, we conclude that intent to injure should be inferred as a matter of law. The allegations imply that some injury or harm was intended. The complaint alleges that Smith knew the representations regarding the oxygen-limiting capacity of the Harvestore were false and, despite this knowledge over

499

a lengthy period of time, never corrected this representation. Smith continued to make the false representation in order to induce a purchase. If the Harvestore was not able to limit the oxygen exposure as represented, Smith, as seller and manufacturer of the system, had to know that some injury or harm was substantially certain to result to the feed stored in the system. Whether Smith intended for the cattle to be injured or the other damages alleged to occur is not relevant. *See Pachucki v. Republic Ins. Co.*, 89 Wis. 2d 703, 712, 278 N.W.2d 898, 903 (1979) (only requirement is that *some* injury is intended). When intentional fraud is committed, its natural and intended consequence is to do harm. *See Cunningham & Walsh, Inc. v. Atlantic Mut. Ins. Co.*, 744 P.2d 1317, 1320 (Or. Ct. App. 1987). The natural and probable consequences of Smith's intentional act are that farmers will purchase this silo and be harmed because the feed stored in the silo will be exposed to oxygen and spoil.

A reasonable person in Smith's position would believe that some injury or harm would follow or was substantially certain to follow from the intentional deceit. The allegations of the complaint contend that Smith made these false representations over a course of many years to induce farmers to purchase the Harvestores; that Smith's own research revealed that these representations were not true; and, that despite such knowledge, Smith did not alter its marketing strategies or inform purchasers of the actual capabilities of the Harvestores. Having knowledge that the Harvestores would not keep the oxygen out of the silos, a reasonable person would believe that some harm would follow. That is, the farmers purchased the feed system expecting that the feed would not be exposed to oxygen and spoil, when, in fact, the feed was going to be

exposed to oxygen and spoil. In considering these factors, we conclude that this is an appropriate case for this court to conclude, as a matter of law, that intent to injure should be inferred.

We are further persuaded by the reasoning in foreign jurisdictions which, like Wisconsin, follow the "substantial certainty" rule for inferring intent to injure. The Georgia Court of Appeals rejected a claim for coverage arising out of fraudulent misrepresentation, concluding that "an action for fraud and deceit must be based upon a representation or concealment which was made with the intention and purpose of deceiving the opposite party and for the purpose of injuring him." *Haley v. Georgia Farm Bureau Mut. Ins. Co.*, 305 S.E.2d 160, 161–62 (Ga. Ct. App. 1983).

Similarly, the Oregon Court of Appeals inferred intent to injure from fraud allegations, reasoning that "deceit, by its nature, is an act from which an intention to cause harm must necessarily be inferred," and "that, when fraud or deceit is committed, its natural and intended consequence is to do harm and, whatever the harm might be, the conduct which brought it about is not an 'occurrence.'" *Cunningham*, 744 P.2d at 1319–20.

Our decision is supported by numerous cases that have concluded that intentional fraudulent allegations should not trigger insurance coverage, including one Wisconsin case, *Smith v. State Farm Fire & Cas. Co.*, 127 Wis. 2d 298, 380 N.W.2d 372 (Ct. App. 1985). In *Smith*, this court held that allegations of intentional infliction of emotional distress and fraudulent breach of contract could not be construed as an "occurrence" under the policy definition, even under the most liberal rules of pleading. *See id.* at 304, 380 N.W.2d at 375. The trial court distinguished *Smith*, however, con-

cluding that the *Smith* complaint contained a specific allegation of intent to injure. Because we have concluded that the intent to injure should be inferred as a matter of law in the instant case, *Smith* lends support to our ultimate holding that the allegations at issue in the instant case do not trigger coverage.[11]

[11] Numerous foreign jurisdictions that have addressed the issue of whether fraudulent allegations constitute an occurrence also offer support for our decision. *See Ellensohn v. American Family Mut. Ins. Co.*, 96 F.3d 1075, 1076 (8th Cir. 1996) (applying Iowa law); *Potomac Ins. Co. v. Peppers*, 890 F. Supp. 634, 643–44 (S.D. Tex. 1995); *Chatton v. National Union Fire Ins. Co.*, 13 Cal. Rptr. 2d 318, 328 (Ct. App. 1992) ("[I]t is well settled that intentional or fraudulent acts are deemed purposeful rather than accidental and, therefore, are not covered under a CGL policy."); *M.L. Foss, Inc. v. Liberty Mut. Ins. Co.*, 885 P.2d 284, 285 (Colo. Ct. App. 1994) (alleged misrepresentations do not constitute an occurrence as that term is uniformly defined in CGL policies); *Hawaiian Holiday Macadamia Nut Co., Inc. v. Industrial Indem. Co.*, 872 P.2d 230, 235 (Haw. 1994) (fraudulent conduct does not constitute an occurrence under CGL policy); *Transamerica Ins. Servs. v. Kopko*, 570 N.E.2d 1283, 1285 (Ind. 1991) (intentional fraudulent conduct not covered); *Western Cas. & Sur. Group v. Coloma Township*, 364 N.W.2d 367, 369 (Mich. Ct. App. 1985); *Columbia Nat'l Ins. v. Pacesetter Homes, Inc.*, 532 N.W.2d 1, 7 (Neb. 1995); *S.L. Indus., Inc. v. American Motorists Ins. Co.*, 607 A.2d 1266, 1277 (N.J. 1992) (holding that fraud is not covered because the element of "intent to induce reliance" constitutes a subjective intent to injure); *Town of Clifton Park v. Home Ins. Co.*, 519 N.Y.S.2d 937, 938 (1987); *Henderson v. USF&G Co.*, 476 S.E.2d 459, 463 (N.C. Ct. App. 1996) (fraudulent concealment not an occurrence because it either intended to cause injury or was substantially certain to result in injury), *aff'd*, 488 S.E.2d 234 (N.C. 1997); *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986) (intentional concealment and intentional misrepresentation are not occurrences).

Our holding is further supported by an examination of the "expected" language portion of the occurrence definition. According to that definition, coverage is provided for an "accident" only if it is "neither expected nor intended from the standpoint of the insured." Our analysis in this opinion has been on the "intended" language of this definition, in part, because the cases focus on this language. Nevertheless, further support for our reasoning in this case can be based on the "expected" language portion of this decision. The complaints allege that Smith made fraudulent representations with respect to the Harvestore's ability to limit the contents of the silo's exposure to oxygen. We can infer from the allegations in the complaint that Smith knew that exposure to oxygen would spoil the feed contained in the silos and, as a result, Smith must have expected the resulting injury to the farmer. Thus, the allegations in the complaint asserting that Smith made such false representations provides a sufficient basis to infer, as a matter of fact, that the injury occurring here was expected from the standpoint of the insured.

Finally, like sexual molestation and armed robbery, we conclude that a reasonable insured would not expect coverage for intentional fraudulent acts.[12] A

---

[12] This decision is limited to allegations of intentional fraudulent acts and should not be construed to decide whether allegations involving strict responsibility misrepresentation or negligent misrepresentation trigger coverage. *See generally Benjamin v. Dohm*, 189 Wis. 2d 352, 360–62, 525 N.W.2d 371, 374–75 (Ct. App. 1994); *Qualman v. Bruckmoser*, 163 Wis. 2d 361, 366, 471 N.W.2d 282, 285 (Ct. App. 1991) (holding that complaints alleging claims for negligent misrepresentation and strict responsibility misrepresentation do not fall within the scope of insurance coverage).

reasonable person would not expect to be able to purchase insurance coverage that would indemnify him or her for damages caused from his or her intentional fraudulent activities. *See Hagen v. Gulrud*, 151 Wis. 2d 1, 6–7, 442 N.W.2d 570, 573 (Ct. App. 1989).

## III. CONCLUSION

In sum, we conclude that the allegations of intentional fraud in the complaints at issue here do not state facts which constitute an occurrence as that term is defined in the CGL policies because the complaints allege intentional acts, i.e., fraud, conspiracy to commit fraud, and RICO fraud violations, and because we infer intent to injure from these allegations as a matter of law. The natural and ordinary consequences of intentional fraudulent acts is to cause some harm. Therefore, the requisite sufficient certainty that Smith intended to cause some harm from the intentional fraudulent conduct is present in this case. As a result, we conclude that the language defining a covered occurrence as "an accident, . . . which results . . . in . . . injury, or . . . damage neither expected nor intended from the standpoint of the insured" operates to preclude coverage. The trial court erred in granting summary judgment in favor of Smith. That order is reversed and this case is remanded to the trial court with directions to grant summary judgment in favor of Continental and Allstate.

*By the Court.*—Order reversed and cause remanded with directions.

SCHUDSON, J. *(concurring)*. Although I agree with much of what the majority has written, I do not join in this opinion primarily because the majority has

addressed the merits of Smith's argument on "reckless misrepresentation."

As the majority explains, Smith orally argued that even if we were to conclude that intent to injure must be inferred in intentional fraud as a matter of law, we still should affirm because the "reckless misrepresentation" claims alleged covered occurrences. As the majority also explains, however, Smith could not resurrect that argument because it failed to present it in its appellate brief. Nevertheless, the majority, inexplicably, then goes on to address the merits of Smith's abandoned argument. Doing so is unnecessary and unwise. After all, because Smith did not present this argument in its brief, the opposing parties had no opportunity to address the issue. Consequently, this court's discussion of the "reckless misrepresentation" issue comes without the benefit of adversarial argument.

Smith's oral argument on the merits of the "reckless misrepresentation" issue was interesting. If properly presented to the court, it could very well have led to an equally interesting response, Smith's reply, and this court's further research based on the parties' arguments. That proper appellate process never took place and, therefore, the majority has correctly concluded that Smith abandoned the issue. Accordingly, we also should refrain from addressing the issue.

I am authorized to state that Judge Gordon Myse joins in this concurrence.