**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 12, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.    2019AP17-CR
2019AP18-CR
STATE OF WISCONSIN**

Cir. Ct. Nos. 2016CF613
2016CF286

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

PARIS MARKESE CHAMBERS,

  DEFENDANT-APPELLANT.

APPEALS from judgments and an order of the circuit court for Milwaukee County:  T. CHRISTOPHER DEE, Judge.  *Affirmed.*

Before Brash, P.J., Dugan and Donald, JJ.

¶1    DUGAN, J.   Paris Markese Chambers appeals the judgments, entered upon his guilty pleas, convicting him of two counts of felony theft, one count of attempting to steal a motor vehicle, one count of stealing a motor vehicle, and two

misdemeanor counts of criminal damage to property, all as a party to a crime; and two counts of bail jumping.[1] He also appeals the trial court's order denying his postconviction motion.

¶2 Chambers argues that he is entitled to relief because his global sentence is harsh and unconscionable. We disagree and affirm.

## BACKGROUND

**The theft case**

*Initial procedural history*

¶3 On January 25, 2016, the State charged Chambers with two counts of theft as a party to a crime in Milwaukee County Circuit Court Case no. 2016CF286. The penalty for each charge was not more than three years and six months of imprisonment, a fine of up to $10,000, or both. The crimes were alleged to have occurred on January 22, 2016.

¶4 Chambers appeared, with counsel, at the January 25, 2016 initial appearance and was released on a $500 personal recognizance bond.

---

[1] These consolidated appeals are from two separate Milwaukee County Circuit Court cases. In January 2016, a case was filed against Chambers and assigned to the Honorable Mark A. Sanders. In February 2016, a second case was filed against Chambers and reassigned to Judge Sanders, since he was presiding over the first case. Judge Sanders presided over both cases through the plea proceedings. Subsequently, the cases were assigned to the Honorable T. Christopher Dee, who presided over the cases through postconviction proceedings. We refer to Judge Sanders as the circuit court and Judge Dee as the trial court.

On appeal, we granted Chambers' motion to consolidate the appeals. For readability, we use the singular, rather than the plural, when we refer to documents filed in both cases.

*Allegations of the complaint*

¶5      The complaint alleged that, at approximately 5:00 p.m. on January 22, 2016, City of Milwaukee Police Officers were dispatched to two automobile accidents within a block of each other.  In the first accident, a vehicle driven by R.V. was hit by a blue Dodge Neon at 3587 South 15th Street.  R.V. told the police that, at the time of the accident, she saw two black males exit the Neon and then get picked up by a silver PT Cruiser.

¶6      In the second accident, the PT Cruiser drove south on 15th Street, disregarded a stop sign at Morgan Avenue, caused an accident at that intersection, and continued southbound.  D.N., who saw the PT Cruiser accident, told the police that he tried to follow that car after the accident, but he found it abandoned in the street.  D.N. waited for the police near the abandoned car.  While he was waiting, a citizen escorted a black male, later identified as Chambers, back to the PT Cruiser.  D.N. and Chambers then waited by the car for the police to arrive.

*Chambers' statement*

¶7      When the police arrived, they advised Chambers of his *Miranda* rights.[2]  Chambers then provided a statement that he, Earl Blackmon,[3] and R.N., a juvenile, had planned to smoke weed; but, they decided to steal cars instead.  When they first tried to steal a car, R.N. got scared and went home, and Chambers and Blackmon did not end up stealing the car.  Later, Chambers and Blackmon stole the silver PT Cruiser (count one) and then drove it and picked up R.N.  After that,

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

[3] Blackmon's surname also appears in the record as Blackman.  We consistently use Blackmon.

Blackmon stole the blue Neon (count two) and drove it with Chambers as a passenger and R.N. drove the PT Cruiser.

¶8     Chambers said that, when the Neon got in the accident, R.N. picked up Chambers and Blackmon in the PT Cruiser, and drove away.  Within a few blocks, the PT Cruiser hit a different vehicle and Chambers, Blackmon, and R.N. ran away.  Chambers said that an armed person brought him back to the scene.

**The attempted theft, theft, criminal damage to property, and bail jumping case**

*Initial procedural history*

¶9     On February 9, 2016, the State filed a second case against Chambers, Milwaukee County Circuit Court Case no. 2016CF613, based on incidents that occurred after Chambers was released on bail in the first case.[4]  Chambers was charged with the following six counts:[5]  one count of attempting to steal a vehicle, one count of stealing a motor vehicle, and two misdemeanor counts of criminal damage to property, all as a party to a crime; and two counts of bail jumping.  The charged crimes occurred on January 28, 2016, February 3 and 4, 2016.

¶10     The complaint alleged that the maximum penalties for the attempted theft, as a party to a crime charge were imprisonment for not more than three years, a fine of up to $5000, or both; and for each of the two criminal damage to property, as a party to a crime charges, imprisonment for nine months, a fine of not more than $10,000, or both.  It further alleged that the maximum penalties for the theft, as a

---

[4] Blackmon was also named in the second case.  Blackmon resolved his charges in Milwaukee County Circuit Court Case no. 2016CF612.  He is not part of this appeal.

[5] The complaint consisted of nine counts.  Chambers was not charged in counts one, four, or five.

4

party to a crime charge were imprisonment for six years, a fine of up to $10,000, or both, and for each of the two bail jumping charges, imprisonment for six years, a fine of up to $10,000, or both.

### *Allegations of the complaint*

¶11    The complaint alleged that at approximately 8:00 p.m. on January 28, 2016, Chambers and Blackmon attempted to steal a Dodge Durango (count two) from an apartment complex parking lot because a silver Jeep Liberty, reported as stolen on January 26, 2016,[6] was low on gas.  Chambers and Blackmon damaged the Durango's ignition and rummaged through its contents.  Additionally, they damaged other vehicles in the parking lot by shooting BB guns at the vehicles.

¶12    At approximately 3:00 a.m. on February 3, 2016, Milwaukee County Sheriff's deputies responded to reports that the stolen Jeep Liberty was at General Mitchell International Airport and two black males, later identified as Chambers and Blackmon, were in the airport parking structure breaking into vehicles, breaking vehicle windows, and shooting BB guns at vehicles.  They broke the driver's side windows of a black 2016 Honda Accord owned by M.B., rummaged through the vehicle, and took $60 from the center console (count three).  Deputies also found forty other damaged vehicles and an insurance card from a red Ford F150 truck, lying on a pile of glass near the damaged vehicles.  The red truck was owned by a contracting business.  It had been reported as missing from the airport parking structure on February 3, 2016.

---

[6] Blackmon was arrested on February 4, 2016, and, after he was advised of his *Miranda* rights, Blackmon gave a statement admitting that he had stolen a Jeep Liberty with Chambers and that he drove it to the airport on February 3, 2016.  When they left the airport in the Jeep, he knew that the police were following the Jeep.  He drove down Howell Avenue and, eventually, abandoned the Jeep near 4638 South First Street.

¶13    On February 4, 2016, K.T. informed the police that, at approximately 1:05 p.m. that afternoon, while she was sitting in her living room, she heard glass breaking, at which point she felt something hit the left side of her face, and she saw several holes in her windows and shards of glass on the floor (count seven). A black male then ran to a red truck parked in the front of her home, and the truck drove off. That day the police received calls from six other individuals in the same general area who reported BB gun damage to their houses and cars, and seeing a large red truck depart after the shots were fired. On February 4, 2016, the police located the contractor's stolen Ford F150 truck (count six) in a restaurant parking lot on 76th Street, where they also arrested Chambers and Blackmon. Chambers was also charged with bail jumping (counts eight and nine) based on his alleged intentional criminal conduct on February 3 and 4, 2016, in violation of the conditions of his release in the theft case—that he not commit new crimes.

¶14    After Chambers was advised of his *Miranda* rights, he gave a statement admitting his role in the crimes charged in the second case. Chambers stated that he searched the cars that he and Blackmon broke into for items to steal and that Blackmon drove the stolen vehicles because he (Chambers) had not learned how to drive.

**Subsequent proceedings in both cases**

¶15    At the July 14, 2016 plea hearing, the State described the plea negotiation in both cases against Chambers, indicating that he would plead guilty to all eight counts and that, at sentencing, the State would read in over sixty additional counts mentioned in the second case. Furthermore, although the State would recommend a prison sentence, it would make no recommendation as to

6

sentence lengths or restitution amounts. Trial counsel and Chambers agreed that the State's description of the plea negotiation was accurate.

¶16    The circuit court then engaged in a plea colloquy with Chambers, which included advising Chambers that the maximum possible sentence for the eight offenses was twenty-nine and one-half years of imprisonment and a fine of up to $75,000, or both. The parties agreed that the circuit court could use the facts alleged in the complaint as the factual basis for the eight counts.

¶17    At the August 16, 2016 sentencing hearing, the State outlined the facts of the offenses as alleged in the complaints, and informed the trial court that, to date, restitution requests had been made by two victims in the first case, and thirty-one out of the sixty-seven victims in the second case.

¶18    The State also advised the trial court that Chambers had engaged in other significant unlawful conduct without any charges being issued, that Chambers had admitted that he had damaged vehicles in the airport parking area more than once, and that he had also damaged parked vehicles at St. Luke's Hospital. Chambers' admissions were consistent with vehicular damage at the airport parking area reported to local law enforcement on January 30, 2016 (one vehicle); January 31, 2016 (twelve vehicles); February 2, 2016 (six vehicles), and February 4, 2016 (six vehicles). The police also received reports of vehicular damage at St. Luke's Hospital on January 30, 2016 (seven vehicles).

¶19    The State requested a prison sentence for Chambers, arguing that "anything other than a prison sentence would unduly depreciate the seriousness of these countless offenses." Trial counsel asked that Chambers be sentenced to one year in the House of Correction, that the sentence be stayed, and that Chambers be placed on probation. The trial court, ultimately, imposed a global sentence of eight

and one-half years of initial confinement, followed by 300 days in the Milwaukee County House of Correction, and thirteen and one-half years of extended supervision.[7] Judgments were entered accordingly.

¶20 On December 10, 2018, Chambers filed a postconviction motion seeking an order modifying his sentences or setting a resentencing hearing.[8] In a written decision and order issued on December 17, 2018, the trial court denied the motion, holding, as relevant to this appeal, Chambers' sentences are neither harsh nor unconscionable.

## DISCUSSION

¶21 Chambers argues that his global prison sentence is unduly harsh and unconscionable and that, therefore, we should modify his sentences or order that he be resentenced. The State argues that Chambers' global sentence is not unduly harsh or unconscionable.

### I. The standard of review and the applicable law

¶22 "We review a trial court's conclusion that a sentence it imposed was not unduly harsh and unconscionable for an erroneous exercise of discretion." *State v. Grindemann*, 2002 WI App 106, ¶30, 255 Wis. 2d 632, 648 N.W.2d 507 (citation and emphasis omitted). This court "will not set aside a discretionary ruling

---

[7] Chambers' initial appellate brief states the trial court imposed a global sentence that included fourteen years of extended supervision. Subsequently, appellate counsel filed a letter indicating that due to an oversight he had failed to mention that the trial court had reduced Chambers' extended supervision by six months for reasons unrelated to this appeal.

[8] Chambers' postconviction motion argued several reasons for sentence modification or resentencing. However, Chambers' sole argument on appeal is that his global sentence is unduly harsh and unconscionable. Chambers is deemed to have abandoned the other grounds raised in his motion. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

of the trial court if it appears from the record that the court applied the proper legal standards to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach." *See id.*

¶23    When a defendant argues that his or her sentence is excessive or unduly harsh, a court may find an erroneous exercise of sentencing discretion "only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).  Further, "[a] sentence well within the limits of the maximum sentence is unlikely to be unduly harsh or unconscionable."  *State v. Scaccio*, 2000 WI App 265, ¶18, 240 Wis. 2d 95, 622 N.W.2d 449.

## II.    The trial court properly concluded that Chambers' global sentence is not unduly harsh or unconscionable

¶24    Chambers argues that this court should modify his sentences or order resentencing because his global prison sentence is unduly harsh and unconscionable.[9]  The issue is whether the trial court erroneously exercised its discretion when it held that Chambers' global sentence for the crimes that he admitted committing by pleading guilty, while also considering the additional uncharged crimes that were read in at sentencing, was so excessive and unusual or so disproportionate to the offenses that Chambers "committed as to shock public

---

[9] Chambers also argues that whether a particular sentence is unduly harsh and excessive is better viewed as a question of law, rather than as whether the trial court erroneously exercised its discretion as required by *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975). However, "[t]he supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case."  *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997).  Therefore, we apply the *Ocanas* erroneous exercise of discretion standard to the issue raised by Chambers.

sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *See* **Ocanas**, 70 Wis. 2d at 185.

¶25 As we explain, we conclude that the trial court properly determined that Chambers' global sentence is neither unduly harsh nor unconscionable. During the plea proceedings, the circuit court advised Chambers that the maximum penalty for the eight offenses to which he was pleading guilty was twenty-nine and one-half years of imprisonment and a fine of up to $75,000, or both. The sentence that the trial court imposed, a global sentence of eight and one-half years of initial confinement, followed by 300 days in the Milwaukee County House of Correction, and thirteen and one-half years of extended supervision sentence, falls well within the limits of the maximum global sentence—making it "unlikely to be unduly harsh or unconscionable." *See* **Scaccio**, 240 Wis. 2d 95, ¶18.

¶26 At sentencing, Chambers characterized his criminal conduct as low-level property crimes committed over a short period of time. He argued, "[T]his was teenage joyriding. This was teenagers breaking windows and rifling through cars, playing with BB guns[.]" The trial court did not agree. The trial court noted that breaking into and stealing vehicles was not joyriding and, that for the owners of the vehicles damaged by the BBs and the woman who was hit by flying glass when the BB gun was shot into her home, Chambers' conduct was not simply "playing with BB guns." Chambers' crimes were serious; they impacted both the direct victims[10] and the larger community; and, as the trial court stated, in its twenty-five years of criminal justice experience, it had "[n]ever seen the breadth or depth

---

[10] Direct victims included the woman who was hit by a flying object in her home because a BB fired by Chambers or Blackmon hit her window. Other individuals were also hurt, and others were placed at tremendous risk of being hurt due to the accidents caused by the vehicles that Chambers stole with Blackmon.

or extent of property damage … by one person." The types of crimes and the sheer number of crimes in which Chambers had engaged had a community wide impact, causing economic and reputational damage to the City and the County.

¶27 In sentencing Chambers, the trial court focused on the need to protect the public—the victims whose property and sense of personal security were affected, and the Milwaukee community, as well as the larger region served by the airport. The trial court further stated that the damage to the vehicles caused the victims to incur the cost of repairing the damage; and the inconvenience and difficulties of losing access to a car. The trial court also stated that Chambers' actions harmed the victims psychologically by causing a loss of trust and a sense of security around their homes and workplaces, anxiety, and an inability to park in garages or to visit certain other places.

¶28 The trial court also focused on punishing Chambers. It stated that the need for punishment was demonstrated by the fact that after Chambers' arrest on the theft case, "he went right out and engaged in the same type of conduct[.]" The fact that Chambers committed the second round of crimes immediately after his release in the first case required the court to send a message that "we just can't have widespread and wanton destruction like this. It is absolutely unacceptable. And it has to be a strong message." We conclude that the trial court properly exercised its discretion when it took into account Chambers' immediate resumption of criminal activity when it focused on the objectives of punishment, protection of the community from him, and deterrence.

¶29 In determining the seriousness of the crimes, the trial court also appropriately considered the uncharged conduct that was read in. The trial court emphasized that the crimes were widespread and that Chambers repeatedly stole

11

and damaged cars and other property. Chambers was charged in only eight counts. However, the prosecutor's office had referrals for more than sixty potential charges that, as the trial court explained, could have exposed Chambers to over 100 years of initial confinement, without considering any extended supervision.

¶30 On appeal, Chambers argues that he "grew up under harsh circumstances[.]" The record reflects that the trial court considered Chambers' traumatic personal history. It stated that Chambers did not have a great childhood and that it was not his fault. His mother died and he moved around in the foster care system. The trial court also considered Chambers' mental health issues, attention deficit hyperactivity disorder (ADHD) and depression. It stated that the ADHD could explain Chambers' actions to the extent they were impulsive. However, it noted that Chambers had planned out the crimes by going to so many locations, arming himself with BB guns, and carrying the tools he used to steal cars. The trial court weighed Chambers' lack of prior criminal record as a mitigating factor. However, the trial court reasonably concluded that the prosecutor's office took that into account when it declined to issue more charges.

¶31 Chambers also relies on cases that state, "[a]s compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not well formed.'" *Graham v. Florida*, 560 U.S. 48, 68 (2010) (citation omitted). He further states that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes," citing *Miller v. Alabama*, 567 U.S. 460, 472 (2012).

12

¶32 The trial court knew that Chambers was seventeen years old at the time he committed these crimes. Further, as noted above, it considered Chambers' background and the harsh circumstances he grew up with.

¶33 Ultimately, the trial court focused on the need to protect the community and the public, the need to punish Chambers, the seriousness of the offenses, Chambers' character, and deterrence. As the trial court aptly stated, "[t]hese may have been 'lower level property crimes' as [Chambers] suggests, but there were a lot of them, an outrageous amount of them, a completely unacceptable amount[.]" (Capitalization, bolding, and large font omitted.) The weight given to the sentencing objectives and factors is left to the trial court's discretion. *See State v. Gallion*, 2004 WI 42, ¶¶17, 40, 46, 270 Wis. 2d 535, 678 N.W.2d 197. Also, as we stated, Chambers' global sentence is well within the limits of the maximum global sentence. *See Scaccio*, 240 Wis. 2d 95, ¶18. Having reviewed the record and the trial court's explanations of its sentencing decision, we are not convinced that Chambers' global sentence shocks public sentiment. *Ocanas*, 70 Wis. 2d at 185.

¶34 Thus, considering the totality of the circumstances, this court concludes that the trial court did not erroneously exercise its discretion in determining that Chambers' global sentence was neither unduly harsh nor a shock to the conscience of the public.

**CONCLUSION**

¶35 For the reasons stated, we affirm the trial court's orders.

*By the Court.*—Judgments and orders affirmed.

Not recommended for publication in the official reports.

13