# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP2259 |
| COMPLETE TITLE: | Dr. Stuart White and Janet White, Plaintiffs-Respondents, v. City of Watertown, Defendant-Appellant-Petitioner, Township of Watertown and Township of Watertown Chairman Richard Gimbler, Defendants. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 378 Wis. 2d 592, 904 N.W.2d 374
PDC No: 2017 WI App 78 - Published

| | |
|---|---|
| OPINION FILED: | January 31, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 10, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Jefferson |
| JUDGE: | Jennifer L. Weston |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Matthew L. Granitz*, *Joseph M. Wirth*, and *Piper*, *Schmidt & Wirth*, Milwaukee. There was an oral argument by *Joseph M. Wirth*.

For the plaintiffs-respondents, there was a brief filed by *Scott B. Rasmussen* and *Rasmussen Law Offices*, Beaver Dam. There was an oral argument by *Scott B. Rasmussen*.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2016AP2259
(L.C. No. 2016CV29)

STATE OF WISCONSIN      :      IN SUPREME COURT

Dr. Stuart White and Janet White,

         Plaintiffs-Respondents,

    v.

City of Watertown,

         Defendant-Appellant-Petitioner,

Township of Watertown and Township of Watertown Chairman

Richard Gimbler,

         Defendants.

**FILED**

**JAN 31, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DANIEL KELLY, J. Some adjoining landowners in the City of Watertown have a long-standing dispute over who must pay to construct and maintain partition fencing between their properties. This case, however, is not about the neighbors' dispute, at least not directly. It is instead about the mechanism by which that dispute is addressed. The Whites say the City of Watertown is responsible for conducting a statutorily-prescribed procedure for resolving fence-related

disputes.  The City of Watertown, on the other hand, says the statutes authorize only towns——not cities——to conduct such proceedings.  For the reasons we describe below, we agree with the Whites and so affirm the court of appeals.[1]

## I.  BACKGROUND

¶2  Dr. Stuart and Janet White (the "Whites") own property in the City of Watertown (the "City") that they (and prior owners) have continuously farmed or grazed since 1839.  Farms previously surrounded the Whites' property, but over time the farms became residential neighborhoods.  The Whites, however, continue to graze their property, which means they——and the adjoining landowners——must keep and maintain partition fences between their respective properties:  "[T]he respective owners of adjoining lands when the lands of one of such owners is used and occupied for farming or grazing purposes, shall keep and maintain partition fences between their own and the adjoining premises . . . ."  Wis. Stat. § 90.03 (2015-16).[2]  The statute assigns responsibility for the fence to all adjoining property owners, each of whom must bear maintenance expenses "in equal shares."  Id.

---

[1] This is a review of a published court of appeals opinion, White v. City of Watertown, 2017 WI App 78, 378 Wis. 2d 592, 904 N.W.2d 374, which affirmed the Jefferson County Circuit Court, the Honorable Jennifer L. Weston, presiding.

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

¶3 Since at least 2010, the Whites and their neighbors have disagreed over their financial obligations for the partition fence between their properties. The legislature anticipated that such disagreements might arise from time to time, so Wisconsin Statutes Chapter 90 ("Chapter 90") contains a detailed procedure for quantifying those costs and allocating them amongst the adjoining owners. We will refer to these provisions as the "Enforcement Procedures," which include Wis. Stat. §§ 90.10-90.12. The Whites have asked the City, on more than one occasion, to engage Chapter 90's Enforcement Procedures to determine and allocate the cost of constructing and maintaining the fencing. Pursuant to several of the Whites' requests, a city alderman went to the Whites' property to view the partition fences. However, because the City does not believe Chapter 90 allows cities to authoritatively determine and allocate fencing costs, the City's efforts never went beyond physically viewing the Whites' fencing.

¶4 The Whites and the City reached an impasse over their divergent readings of Chapter 90, and eventually the city attorney invited the Whites to test their interpretation in court. They obliged. Their complaint sought: (1) a declaration of rights and duties under Chapter 90; and (2) a

writ of mandamus or injunctive relief.[3] Specifically, the Whites say they "need to have their fences repaired and new fenc[ing] put in," and that "[t]here will always be a need in the future to maintain said fencing." They asserted that Chapter 90 gives them the right "to have the appropriate governmental body under Chapter 90, Wis. Stats, partition fencing, and to apportion the cost of erecting and maintaining fences on the boundaries of the plaintiffs' land." Based on its prior responses, the Whites believe the City will refuse to administer the Enforcement Procedures without an authoritative declaration of rights.

¶5 The City moved to dismiss, arguing (inter alia) that the Whites failed to state a cause of action because Chapter 90 does not authorize cities to administer the Enforcement Procedures. The circuit court denied the City's motion and simultaneously granted the Whites' requested declaratory relief.[4] It held that "all provisions of Chapter 90 apply to the City, despite a failure of specific reference therein to 'cities.'"

---

[3] In addition to the City of Watertown, the complaint also named City of Watertown Mayor John David, City of Watertown Alderman Kenneth Berg, the Town of Watertown, and Town of Watertown Chairman Richard Gimbler as defendants. The circuit court dismissed these parties for various reasons, which dismissals the Whites do not challenge.

[4] The circuit court dismissed the Whites' request for relief in the form of mandamus or an injunction, holding that the case's posture was not ripe for such relief. The Whites do not challenge that determination.

4

¶6 The City appealed the circuit court's grant of declaratory relief and the court of appeals affirmed.[5] Like the circuit court, the court of appeals' analysis centered on the perceived ambiguity of Chapter 90's apparently exclusive references to towns when describing the Enforcement Procedures. After consulting legislative history, however, the court of appeals concluded that Chapter 90 authorizes cities as well as towns to conduct those proceedings. White v. City of Watertown, 2017 WI App 78, ¶¶2-4, 378 Wis. 2d 592, 904 N.W.2d 374.

¶7 We granted the City's petition for review and now conclude that Chapter 90 unambiguously authorizes cities to administer the Enforcement Procedures. Consequently, we affirm the court of appeals, but for different reasons.

## II. STANDARD OF REVIEW

¶8 The Whites' request for a declaration of rights pursuant to the terms of Chapter 90 presents a question of law, which we review de novo. See CED Props., LLC v. City of Oshkosh, 2018 WI 24, ¶20, 380 Wis. 2d 399, 909 N.W.2d 136.

## III. ANALYSIS

¶9 The City urges us to declare that Chapter 90 does not authorize cities to administer the Enforcement Procedures

---

[5] The City did not argue that the circuit court erred in denying any of the procedural grounds for dismissal, and so we consider them abandoned. See, e.g., A.O. Smith Corp. v. Allstate Ins. Cos., 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").

because the constitutive statutes explicitly empower only towns to do so while not mentioning cities at all. Consequently, the City argues, we would be unfaithful to the statutory text if we nonetheless concluded that cities, too, have authority to administer the Enforcement Procedures. It says we could not reach such a conclusion without adding new text to Chapter 90 for the express purpose of enlarging its remit.

¶10 The principle behind the City's argument is well-received——it is not for us to change statutory text. Instead, our responsibility is to ascertain and apply the plain meaning of the statutes as adopted by the legislature. To do so, we focus on their text, context, and structure. "[S]tatutory interpretation 'begins with the language of the statute[,]'" and we give that language its "common, ordinary, and accepted meaning[.]" State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110 ("Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes . . . ."). In performing this analysis, we carefully avoid ascribing an unreasonable or absurd meaning to the text. Id., ¶46 ("[S]tatutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results."). We may also look to the statute's history where, as here, there has been a significant revision to the language in which we are interested.

6

Cty. of Dane v. LIRC, 2009 WI 9, ¶27, 315 Wis. 2d 293, 759 N.W.2d 571 ("'A review of statutory history is part of a plain meaning analysis' because it is part of the context in which we interpret statutory terms." (citation omitted)). That history "encompasses the previously enacted and repealed provisions of a statute." Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581. "By analyzing the changes the legislature has made over the course of several years, we may be assisted in arriving at the meaning of a statute." Id. If we determine the statute's plain meaning through this methodology, we go no further. Kalal, 271 Wis. 2d 633, ¶45 ("If the meaning of the statute is plain, we ordinarily stop the inquiry." (internal marks and citation omitted)). See generally Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969 (2017).

¶11 The City's argument, therefore, requires that we review the statutes relevant to the Enforcement Procedures to determine whether their plain meaning empowers cities, as well as towns, to resolve fencing disputes.[6] The parties tell us we may find the answer in Wis. Stat. §§ 90.01 (Fence viewers), 90.03 (Partition fences; when required), 90.05 (How partition made), 90.07 (Division of partition fence), 90.10 (Compulsory repair of fence), 90.11 (Cost of repairs), and 90.12

[6] The purpose of our review is, however, very limited. We express no opinion on whether the Whites have complied with the requirements of Chapter 90 or, more specifically, the procedural aspects of the Enforcement Proceedings.

(Apportionment of cost of fence). We will consider each of these statutes with a specific focus on what they say about the type of municipality to which they apply. Following that analysis, we will address an additional statutory provision that neither party mentioned, but which is nonetheless critical to the question before us.

¶12 The parties do not contest the necessity for partition fencing between the Whites' land and adjoining properties. We have no doubt of its necessity because the statutory command is unequivocal: "[T]he respective owners of adjoining lands when the lands of one of such owners is used and occupied for farming or grazing purposes, shall keep and maintain partition fences between their own and the adjoining premises in equal shares so long as either party continues to so occupy the lands . . . ." Wis. Stat. § 90.03. Nothing in this statute suggests its requirements apply only when the land is located outside of city limits. Because the Whites graze their property, we take it as established that partition fences must separate their land from adjoining properties.

¶13 However, we encounter municipality-specific statutory references almost immediately upon commencing our inquiry into the landowners' respective responsibilities for the fencing. Although all property owners along the fence line must share in its cost, Chapter 90 contains a mechanism for apportioning the responsibility for actually building and maintaining the fence. This partitioning of responsibility can occur either before the

fence's construction (Wis. Stat. § 90.05), or afterwards (Wis. Stat. § 90.07). The pre-construction statute provides that

> [e]very partition of a fence or of the line upon which partition fences are to be built between owners of adjoining lands, after being recorded in the town clerk's office, obligates the owners, their heirs and assigns to build and maintain the fence in accordance with the partition, if any of the following conditions is met: . . . The partition is made by fence viewers in the manner provided under this chapter and is in writing under their hands.

§ 90.05(1)(a)2. (emphasis added). The post-construction statute is, seemingly, similarly specific with respect to the type of municipality in which the construction and maintenance obligations may arise. A property owner who wishes to partition responsibility for a pre-existing fence may apply "to 2 or more fence viewers of the town where the lands lie or to 2 or more fence viewers of 2 towns, if the lands lie in 2 towns . . . ." § 90.07(2) (emphasis added). Once the fence viewers assign responsibility to the respective owners, they "shall file such decision in the town clerk's office, who shall record the same." Id. (emphasis added).

¶14 As we turn to the statutes comprising the Enforcement Procedures, we continue encountering municipality-specific references. The parties identify three circumstances in which Chapter 90 allows a landowner to engage these proceedings. In each of them, the City says, the applicable statute assigns enforcement responsibilities to towns, not cities. The first circumstance involves a landowner who has failed in his responsibility to maintain or repair a partition fence. The

9

applicable statute provides that, "[i]f any person neglects to repair or rebuild any partition fence that by law that person is required to maintain, the aggrieved party may complain to 2 or more fence viewers of the town, who, after giving notice as provided in s. 90.07, shall examine the fence." Wis. Stat. § 90.10 (emphasis added). The second circumstance arises when a landowner shoulders the burden of building, repairing, or rebuilding a partition fence for which an adjoining landowner is actually responsible. The Enforcement Procedures allow the landowner to recover his fence-related expenses from the responsible owner, a process that begins with a complaint to the fence viewers:

> Whenever any owner or occupant of land has built, repaired or rebuilt any fence, pursuant to the provisions of this chapter, that the adjoining owner or occupant has been lawfully directed by fence viewers to build, repair or rebuild but has failed to do within the time prescribed, the owner or occupant who built, repaired or rebuilt the fence may complain to any 2 or more fence viewers of the town.

Wis. Stat. § 90.11(1)(a) (emphasis added). The final circumstance identified by the parties involves landowners who refuse to contribute to the maintenance of a partition fence built at the expense of an adjoining landowner:

> When, in any controversy that may arise between occupants of adjoining lands as to their respective rights in any partition fence, it shall appear to the fence viewers that either of the occupants had, before any complaint made to them, voluntarily erected the whole fence, or more than that occupant's just share of the same, or otherwise become proprietor thereof, the other occupant shall pay for so much as may be assigned to him or her to repair or maintain; the just

10

> value thereof which the other occupant ought to pay shall be ascertained by proceeding as prescribed in s. 90.11.

Wis. Stat. § 90.12. Although this provision does not have a municipality-specific reference, it directs the complaining landowner back to § 90.11, which requires a complaint to "any 2 or more fence viewers of the town." § 90.11(1)(a).

¶15 Out of all the Chapter 90 provisions cited by the parties, only one mentions municipalities other than towns. But it is a provision without which neither of the partition statutes nor any of the Enforcement Procedure statutes could operate. In each of these statutes, the officials through whom the municipality acts are "fence viewers." The corps of these officials is established by Wis. Stat. § 90.01: "The supervisors in their respective towns, the alderpersons of cities in their respective aldermanic districts, and the trustees of villages in their respective villages shall be fence viewers."

¶16 Taking these statutes together, the City concludes it is without authority to resolve the Whites' dispute with their neighbors. The City believes that Chapter 90 creates obligations amongst neighboring landowners that can arise (or be enforced) only in towns. So it maintains that the Whites can have no dispute with their neighbors cognizable under Chapter 90 because their property all lies within Watertown's city limits, not that of a town. And, it argues, Chapter 90 gives the City no authority to enforce those obligations because each of the Enforcement Procedure statutes requires the proceeding to

11

commence with a complaint to "fence viewers of the town." The City is nonplussed by the fact that Chapter 90 allows an alderperson to serve as a fence viewer. This, it says, simply expands the corps of potential fence viewers; it does not confer any substantive authority on cities to administer the Enforcement Procedures.

¶17 In any event, the City says, even if the statutes allowed it to resolve the dispute between the Whites and their neighbors, their ultimate remedy under Chapter 90 is administered through a town, not a city. When an adjoining landowner fails to pay the amount directed by the fence viewers' certificate, the complaining owner files the certificate with the "clerk of the town" in which the adjoining owner's property is located.[7] The clerk then "issue[s] a warrant for the amount of the listed expenses and fees upon the town treasurer payable to the person to whom the certificate was executed and delivered." Wis. Stat. § 90.11(2)(a). But there is no statutory authority for a city clerk to issue a warrant upon a city treasurer, the City says, so Chapter 90 gives the Whites no remedy even if it had the authority to decide the fencing dispute.

---

[7] "The complaining party may file the certificate executed and delivered to him or her under sub. (1) (b) with the clerk of the town in which the lands charged with the expense and fees set forth in the certificate are located." Wis. Stat. § 90.11(2)(a).

¶18 The City's position is plausible, but ultimately unsustainable. There is a discordant note in its reasoning, a harrying insistence that some of the statutory pieces are not assembled quite right. The dissonance that finds no resolution in the City's explanation relates to the corps of fence viewers. The City says Wis. Stat. § 90.01 does nothing but identify who may serve in that capacity. But its express terms do more than that——they also identify where the fence viewers may perform their official functions. That is, town supervisors are not fence viewers wherever they may roam, they are fence viewers only "in their respective towns[.]" § 90.01.[8] The same is true of village trustees——they are fence viewers "in their respective villages[.]" Id. And city alderpersons are fence viewers only "in their respective aldermanic districts[.]" Id.

¶19 That means an alderperson who crosses from his city to a neighboring town loses the authority to perform the functions of a fence viewer. Indeed, he loses that authority even if he merely steps into an adjacent aldermanic district. So if Chapter 90 does not authorize cities to administer the Enforcement Procedures, then it left alderpersons with nothing

---

[8] However, when a fence tracks the line dividing towns, or it lies partly in one town and partly in another, alderpersons from the affected towns serve as fence viewers. Wis. Stat. § 90.14.

13

to do even as it constituted them as fence viewers.[9] By itself, this is at least a curiosity, and perhaps at most an invitation to read the chapter as ambiguous with respect to whether it grants any fence-related authority to cities and villages. But this statutory provision does not exist on its own, and when placed amongst all the relevant statutes, the dissonance suggested by the City's argument resolves to a harmonious whole.

¶20 The key to the proper understanding of Chapter 90 is Wis. Stat. § 990.01, which instructs us on the proper construction of statutes. The City noted, correctly, that this statute directs that "[i]n the construction of Wisconsin laws the words and phrases which follow shall be construed as indicated unless such construction would produce a result inconsistent with the manifest intent of the legislature[.]" § 990.01. But somehow both the City and the Whites overlooked the statute's sixtieth rule, which tells us that "'Town' may be construed to include cities, villages, wards or districts." Wis. Stat. § 990.01(42). Because these rules are mandatory ("shall be construed") we must consider, when applying Chapter

---

[9] Reading Wis. Stat. § 90.01 as creating an undifferentiated pool of fence viewers who are free to enter towns across the state to resolve fencing disputes would require that we overlook the statute's geographical limitations. We try not to ignore statutory text. See State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage.").

14

90, whether we should understand "town" to also mean "city." On the answer to that question there can be no doubt.

¶21 Applying this rule to the question before us entirely eliminates the ambiguity that the parties, the circuit court, and the court of appeals all saw in Chapter 90. Each of the statutes we have considered makes perfect sense when we read "town" to include "city." For instance, the pre-construction partition statute (Wis. Stat. § 90.05) works seamlessly within city limits because where it says that the partition shall be recorded with the "town clerk's office," we may read that provision as the "city clerk's office." Similarly, we may read the post-construction partition statute (Wis. Stat. § 90.07(2)) as applying within the "city where the lands lie." The same is true of the statutes addressing the three circumstances in which a landowner may wish to engage the Enforcement Procedures. In the first——that is, when a landowner has failed in his responsibility to maintain or repair a partition fence——an adjoining landowner "may complain to 2 or more fence viewers of the [city] ~~town~~, who, after giving notice as provided in s. 90.07, shall examine the fence." Wis. Stat. § 90.10. The rule allows the same substitution when a landowner performs fencing duties that lawfully belong to another (the second circumstance). Wis. Stat. § 90.11(1)(a) ("[T]he owner or occupant who built, repaired or rebuilt the fence may complain to any 2 or more fence viewers of the [city] ~~town~~."). And because the statute addressing the third circumstance (landowners who refuse to contribute to the maintenance of a

15

partition fence) refers back to § 90.11 for the proper procedure, Wis. Stat. § 90.12 makes a city competent to resolve the fencing dispute.

¶22 This also resolves the City's concern that, even if cities could administer the Enforcement Procedures, they would still lack the authority to provide the remedy described by Chapter 90. With the help of Wis. Stat. § 990.01(42), a complaining landowner in the City may file his certificate of fence-related expenses with the city clerk instead of a town clerk. Wis. Stat. § 90.11(1)(c). And whereas in the absence of § 990.01(42) only a town clerk would have the authority to issue a warrant on the town treasurer in the amount of the landowner's fencing expenses, this statutory rule of construction allows a city clerk to issue such a warrant on the city treasurer. § 90.11(2)(a).

¶23 Finally, returning full circle to the statute that alerted us to the dissonance and ambiguity in the City's interpretive methodology (Wis. Stat. § 90.01), we can now understand it as fitting neatly into the overall statutory scheme. Indeed, in light of Wis. Stat. § 990.01(42), the composition of the corps of fence viewers is not just logical, it is necessary. Chapter 90's creation of enforceable fence-related obligations in both cities and villages called forth a need for fence viewers authorized to administer the Enforcement Procedures in those types of municipalities. The legislature satisfied that need by making alderpersons and trustees a part of the corps. § 90.01. And whereas the geographical limitation

16

on a fence viewer's authority is a disposable oddity in the City's understanding of Chapter 90, in reality it creates a logical relationship of accountability between the fence viewer and the residents of the political subdivision he already serves.[10]

¶24  We agree with the City's admonition that we must take the statutory text as we find it, and we honor it with this reading of the relevant statutes.  Any other reading would break faith with the principles we described in <u>Kalal</u>.  271 Wis. 2d 633, ¶¶45-46.  We could not accept the City's argument without turning significant portions of Wis. Stat. § 90.01 into surplusage.  Nor would our textual analysis have been complete without referring to the statutorily-prescribed rule of construction that instructs us to consider construing "town" to also mean "city" or "village."[11]

---

[10] We are mindful that Wis. Stat. § 990.01 says its rules of construction apply unless the result would be "inconsistent with the manifest intent of the legislature[.]"  And we are also mindful that § 990.01(42) says that "'[t]own' <u>may</u> be construed to include cities, villages, wards or districts." (Emphasis added.)  Both of these passages indicate that this rule of construction, like all rules of construction, must not be deployed mechanically.  For the reasons we described, <u>supra</u>, § 990.01(42) makes Chapter 90 applicable to cities as well as towns.  So our holding is limited to Chapter 90, and we express no opinion on what effect, if any, § 990.01(42) would have on statutory provisions outside of Chapter 90.

[11] We do not employ Wis. Stat. § 990.01(42) to interpret "town" to mean "city" or "village" in Wis. Stat. § 90.01 (the statute creating the corps of fence viewers).  The rule of construction that allows that inclusive reading applies "unless such construction would produce a result inconsistent with the manifest intent of the legislature." § 990.01.

In adopting Wis. Stat. § 90.01, the legislature carefully distinguished between the officials of each type of municipality (town, city, and village) and limited the officials' service as fence viewers to their respective jurisdictions.  If we substituted "city" for "town" in this context, we would contravene the legislature's clear limitation on a fence viewer's geographical authority.

(continued)

17

¶25 Perhaps not incidentally, this also answers the City's challenge that Chapter 90's history illustrates that it applies only to towns.[12] The City accurately observed that, originally, our laws made only those who owned property in towns responsible for maintaining partition fences. Consequently, the only fence viewers were town officials. Wis. Rev. Stat. ch. 14, § 20 (1849) ("The overseers of highways in the several towns in this state shall be fence viewers in their respective towns."). Therefore, it is true that, in 1849, cities had no authority to administer Enforcement Procedures. But then the City's historical analysis hit a snag.

¶26 The City says that, in 1878, the legislature expanded the corps of fence viewers to include city officials, but did not simultaneously authorize cities or villages to enforce the landowners' partition fence-related obligations. The City is mistaken in two material respects. First, the legislature added city and village officials to the corps of fence viewers in 1875, not 1878. And while doing so, the legislature did simultaneously authorize city and village officials to enforce the landowners' duties within their respective jurisdictions:

> Section 1. Chapter seventeen (17), of the Revised Statutes, entitled, "Of fences and fence-owners [viewers]; of pounds and the impounding of cattle, and

[12] We do not discuss statutory history here as an aid in determining the plain meaning of the statutes in question, which we have already discovered without reference to it. Instead, we address it out of respect for the City's argument and to demonstrate that there are no anomalies in our analysis.

the acts amendatory thereto,"[13] is hereby amended so as to read as follows: Section twenty-five (25).  The provisions of this chapter and of the acts amendatory thereto, shall extend to and include all out-lots occupied and used for agricultural purposes, and embraced in the plat of any incorporated city or village within this state, <u>and the aldermen of the respective wards of such city, and the trustees of any such village, are hereby empowered, and it is hereby made their duty, to discharge the duties imposed upon fence-viewers of the several towns, as provided by this chapter, in their respective wards and villages.</u>

§ 1, ch. 285, Laws of 1875 (emphasis added).

¶27 The City's second historical error was its misapprehension of what occurred in 1878.  The legislature did not alter a city's authority to enforce fencing obligations; it simply changed the statutory structure in a way that prefigured today's interplay between Chapter 90 and Wis. Stat. § 990.01(42).  The legislature eliminated the 1875 language that had explicitly referenced cities and villages within the statutory material describing their enforcement authority.  The resulting statute was evocative of (but not the same as) what appears in Chapter 90 today.  So, for example, it provided that:

> When any controversy shall arise about the right of the respective occupants in partition fences, or their obligation to maintain the same, either party may have the line divided, and the share of each assigned.  In either such case, application may be made to two or more fence viewers <u>of the town where the lands lie</u> . . . .

---

[13] The Laws of 1871 carried forward the composition of the fence viewer corps as it was constituted in 1849:  "The overseers of highways, in the several towns in this State shall be fence viewers in their respective towns."  § 21, ch. 17, Laws of 1871.

19

Wis. Rev. Stat. ch. 55, § 1393(3) (1878) (emphasis added). But simultaneously with this change, it also adopted a rule of statutory construction that is nearly identical to § 990.01(42): "The word 'town' may be construed to include all cities, wards or districts, unless such construction would be repugnant to the provisions of any act specially relating to the same." Wis. Rev. Stat. ch. 204, § 4971(17) (1878).[14] And the corps of fence viewers in 1878 comprised "[t]he overseers of highways in their respective towns, the aldermen of cities in their respective wards, and the trustees of villages in their respective villages, . . . and in towns having less than three road districts, the supervisors shall also be fence viewers." Wis. Rev. Stat. ch. 55, § 1389 (1878). So, contrary to the City's assessment of Chapter 90's history, cities were authorized to enforce fencing obligations in 1878 just as they are now.

## IV. CONCLUSION

¶28 Although we affirm the court of appeals, we have traveled a different analytical route. The court of appeals reasoned that the legislature inadvertently eliminated a city's authority to administer the Enforcement Procedures in 1878. Its conclusion that Chapter 90 is ambiguous probably stems chiefly from the parties' failure to bring Wis. Stat. § 990.01(42) to

---

[14] This rule of statutory construction did not specifically refer to villages, so it is possible that they lost the authority to administer the Enforcement Procedures at that time. However, this is not material to the resolution of this case, so we do not explore it further.

20

its attention. However, as we described above, the legislature never eliminated a city's authority to enforce landowners' partition fence-related obligations, it merely restructured the manner in which it expressed the authorization. That structure has carried forward to Chapter 90 and § 990.01(42). So we conclude that Chapter 90's plain language, when read in light of § 990.01(42), unambiguously authorizes the City to administer the Enforcement Procedures.

*By the Court.*—The decision of the court of appeals is affirmed.