## COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 6, 2021

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP2105**

Cir. Ct. No. **2020ME2**

## STATE OF WISCONSIN

## IN COURT OF APPEALS
## DISTRICT IV

IN RE THE COMMITMENT OF J.J.K.:

ROCK COUNTY,

    PETITIONER-RESPONDENT,

  V.

J. J. K.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Rock County: JEFFREY S. KUGLITSCH, Judge. *Affirmed*.

¶1 BLANCHARD, J.[1] J.J.K. appeals two circuit court orders: one granting Rock County's petition to extend a prior involuntary commitment for 12

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

months and the other granting the County's request for an order of involuntary medication and treatment during the period of extended commitment or until further order of the court. *See* WIS. STAT. §§ 51.20(13)(g)1., 51.61(1)(g)4. Regarding the recommitment order, J.J.K. primarily argues that the evidence was insufficient to show that, as of the time of the court's challenged ruling, he was "currently dangerous" to himself, as the circuit court determined. Regarding the order for involuntary medication and treatment, J.J.K. argues that the County failed to prove that he was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to medication under the applicable statutory standards, because he was not fully informed about his options.

¶2      I conclude that there was clear and convincing evidence to support the circuit court's determination that there was "a substantial likelihood" that J.J.K. "would be a proper subject for commitment if treatment were withdrawn," *see* WIS. STAT. § 51.20(1)(am), based on sufficient proof of a substantial likelihood of dangerousness based on an inability to care for himself under the "fourth standard," *see* § 51.20(1)(a)2.d. I separately conclude that there was also clear and convincing evidence sufficient to support the order for involuntary medication and treatment, including sufficient proof of his knowledge about options. Accordingly, I affirm.

## BACKGROUND

*Petition For Recommitment*

¶3      In January 2020, J.J.K. was initially committed and subjected to involuntary medication. In May 2020, Rock County petitioned for recommitment, alleging that he is mentally ill, a proper subject for treatment, and a danger to himself or others. The petition explained that J.J.K., then 34, was residing in an

apartment and was being "followed on an outpatient basis by [the] Janesville Counseling Center." It reported that Dr. Jeffrey Marcus had evaluated J.J.K. on May 19, 2020, and that Dr. Marcus "recommends extension of the current commitment." The petition represented that J.J.K. had "made significant improvements over the period of commitment," but that "[t]reatment staff believe that if not committed to treatment, [J.J.K.] would not comply and would decompensate to a dangerous level of functioning once again."

¶4      The circuit court held a hearing on the petition on July 22, 2020, at which two witnesses testified, both called by the County: Dr. Marcus, a psychiatrist, and Dr. James Black, a psychologist. J.J.K. did not personally testify. At the hearing, his counsel did not challenge either the qualifications of either Dr. Marcus or Dr. Black, nor did counsel challenge the reliability of their expert testimony. Each expert testified that he had recently conducted a mental status examination with J.J.K., reviewed treatment records, and consulted with treatment staff. Each also testified that he had filed a report with the court based on these information sources. The court received both reports into evidence.

*Hearing Evidence*

¶5      Dr. Marcus testified to the following regarding J.J.K.'s mental illness. J.J.K. has a dual diagnosis of a mental illness and developmental disability.[2] J.J.K.'s mental illness diagnosis is "an unspecified psychotic disorder, likely schizophrenia," which affects his "thought and perception" and "impairs his

---

[2] J.J.K.'s developmental disability diagnosis is an "autism spectrum disorder" and is not the focus of arguments by either side in this appeal. Neither side disputes testimony by Dr. Marcus that, as a general rule, autism is not a treatable mental illness.

judgment, behavior, capacity to meet the demands of daily life," and his "ability to recognize reality." He has "psychotic symptoms"—which include "acute paranoia," "agitation," "lability,"[3] and "disorganization"—with "treatable components." The "primary features" of this mental illness include "dysfunction with lack of judgment" and an "inability to manage himself safely."

¶6    In his report, Dr. Marcus stated that treatment records reflect that J.J.K. was initially committed after he "was unwilling to accept assistance with housing or other services due to his paranoid beliefs," and "afraid to accept food because of fears of being poisoned."

¶7    In a similar vein, Dr. Black testified to the following regarding J.J.K.'s mental illness. J.J.K.'s "psychiatric profile" is "complicated," but "I believe he is diagnosed with schizophrenia with a predominance of negative symptoms." "Negative symptoms" for a patient with schizophrenia include being "isolative," "withdrawn," having "odd social behaviors, difficulty interacting with others." The schizophrenia affects J.J.K.'s "thought, mood, and perception," and "impairs his judgment, behavior, capacity to recognize reality, [and] ability to meet the demands of daily life."

¶8    Dr. Marcus testified that when he met with J.J.K. in May 2020, Dr. Marcus "did not notice acute paranoia. [J.J.K.] was organized when he talked to me. There was no evidence of lability." Since the initial commitment, J.J.K. "has

---

[3] "Labile" means "readily or continually undergoing … change or breakdown." *Labile*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/labile (last visited May 3, 2021).

gotten a residence in Janesville, and I believe that [things have] been going fairly well for him."

¶9      Consistent with this testimony, Dr. Black testified to the following on related topics. J.J.K. "is not presenting with any obvious symptoms," having "been on medications for a while now," and is "showing notable improvement." J.J.K.'s improvement was reflected in: his agreement to stay in an apartment instead of living under a bridge (as Dr. Black testified he had done, when not treated, for a year and half); his "displaying some better evidence of ability to interact with others"; his having "some insight into his complicated situation"; and there being no "reports of periods of agitation or lability or paranoid delusions."

¶10     Dr. Marcus testified that, at the time of his interview with J.J.K., he was being treated "on a long-acting psychotic medication called Invega Sustenna and that was working quite well in stabilizing his symptoms." Dr. Black testified that psychotropic medication has been J.J.K.'s "predominant treatment," although there has also been some "case management" and "community-based contacts."

¶11     However, J.J.K. told Dr. Marcus that he would stop taking this medication "if he were off of commitment." Dr. Black also testified that J.J.K. made clear to him that, absent a court order requiring treatment, J.J.K. would not continue with the treatment.

¶12     Dr. Marcus testified that the medication had a "fairly significant[]" therapeutic value for J.J.K., and that if J.J.K. stopped taking it then he would become a proper subject for commitment. This was because Dr. Marcus expected "that the paranoia would increase, the thought disorganization would increase, and that his overall level of functioning would decline." Dr. Black also testified that if

J.J.K. went off treatment with psychotropic medication he would become a proper subject for treatment.

¶13    Dr. Marcus testified that he explained to J.J.K. the advantages of taking the medication (to treat his paranoia and to reduce agitation and lability) and disadvantages ("sedation, abnormal muscle movements, weight gain, metabolic disturbance, pain at the injection site," and restlessness). Dr. Marcus also "[v]ery briefly mentioned" to J.J.K. "that other psychotropic medications, either oral or injectable, can sometimes be used and that other interventions like therapy and case management services can be provided."

¶14    Dr. Marcus testified that he did not believe that J.J.K. was able to apply an understanding of the advantages and disadvantages of the medication to his situation, because J.J.K. "did not believe that he had a treatable mental illness which would require this type of medication." Consistent with this, in his report Dr. Marcus stated that J.J.K. "has consistently denied having a psychotic illness," and that his "insight into the presence and nature of his mental illness appeared grossly impaired" because he "essentially denied have a psychotic illness." Dr. Marcus also testified that the current level of outpatient treatment "would seem appropriate" as the least restrictive treatment option to meet his needs.

¶15    In his report, Dr. Marcus stated the following in addressing dangerousness that could result from discontinuing treatment, resulting in J.K.K. no longer taking the medication:

> There is a substantial likelihood of psychotic decompensation if current treatment were [to be] withdrawn. This would result in an increased risk of dangerousness, primarily to self. Of specific concern would be grossly impaired judgment and a decline in [J.J.K.'s] ability to satisfy his basic care needs. It appears

that his risk of dangerousness has lessened with his current psychotropic treatment.

At the hearing, the circuit court asked Dr. Marcus to elaborate on this passage of his report. Dr. Marcus responded:

> One of the most concerning aspects of what was going on at the time of his [initial] commitment was his residing outdoors in very cold weather and so lack of judgment and an inability to satisfy issues of shelter, issues of nutrition. There was concern that he was paranoid about food and was not accepting of that. There were basic care needs concerns which were raised in the record.

Drs. Marcus and Black each testified that neither was aware of a recurrence, since J.J.K.'s initial commitment in January 2020, of any of the dangerous behaviors that resulted in the initial commitment, although they attributed that to his being medicated.

*Arguments Of The Parties To The Circuit Court*

¶16 The County made an argument based in part on WIS. STAT. § 51.20(1)(a)2.d. (the County referred to it not by statute number but as "the fourth standard"), which addresses concern about the ability of the committed person care for him or herself (more specifically, "to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue."). The County contended that, under the fourth standard, recommitment of J.J.K. is necessary "to stop the revolving door of commitment, improvement, withdrawal of treatment, and then coming back under a commitment." This "revolving door" concept was a transparent reference to § 51.20(1)(am), which provides an "avenue for proving dangerousness" "reflecting a change in circumstances occasioned by an

7

individual's [prior] commitment and treatment" and "acknowledg[ing] that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e." *See Portage Cnty. v. J.W.K.*, 2019 WI 54, ¶¶19, 24, 386 Wis. 2d 672, 927 N.W.2d 509.[4]

¶17 Counsel for J.J.K. argued that the County had failed to show that, even if J.J.K. were to stop receiving psychotropic medication and even if this diminished his ability to care for himself to some degree, "a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue." Counsel noted that our supreme court has explained that the "[i]nability to care for oneself does not equate with a 'substantial probability' that 'death, serious physical injury, serious physical debilitation, or serious physical disease' would ensue if treatment were withdrawn." *See Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶53, 391 Wis. 2d. 231, 942 N.W.2d 277. Counsel did not present an independent, developed argument against the proposed order for involuntary medication and treatment.

*Circuit Court Decisions*

¶18 The circuit court reached determinations regarding recommitment that included the following. J.J.K. suffers from the mental illness of

---

[4] The court of appeals has explained that WIS. STAT. § 51.20(1)(am) aims

> to avoid the "revolving door" phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted ... [in] a vicious circle of treatment, release, overt act, recommitment.

*State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987).

schizophrenia, which is treatable, as demonstrated by the undisputed fact that J.J.K. made "tremendous improvement" since the initial commitment. The testimony of both experts support a dangerousness finding, as seen through the lens of WIS. STAT. § 51.20(1)(am). The critical question is whether there was sufficient evidence to show that, if treatment were withdrawn, J.J.K. would not be "able to care for himself … and suffer [from failure to meet] his basic needs," which the court explained meant his needs "for nourishment," "medical care," "shelter[]," and "safety." The court answered this question yes. In explaining its conclusion, the court referred to "a fifth standard type category," which on its face evokes § 51.20(1)(a)2.e., but the language used by the court about being "able to care for himself" could only be reference to "the fourth standard," § 51.20(1)(a)2.d., which was the standard that had just been argued by the County.[5]

¶19     Regarding the order for involuntary medication and treatment, the court credited the testimony of Dr. Marcus that J.J.K. "is substantially incapable of applying an understanding of [the] advantages, disadvantages, and alternatives to his condition in order to make an informed choice as to whether to accept or refuse psychotropic medication."

¶20     Based on those rulings, the court granted the County's request to extend the commitment for 12 months and to order involuntary medication and treatment, and issued corresponding orders. J.J.K. appeals.

---

[5] The circuit court also made a passing reference to a concern that J.J.K. might potentially harm others if he stopped taking his medication. But the court did not appear to rest its decisions on this ground and further there was little in the expert testimony to support this as a ground for recommitment. Accordingly, I do not consider this as a basis to affirm the circuit court.

**DISCUSSION**

### I.      LEGAL STANDARDS

#### A.      Standards Of Review

¶21      The appellate court upholds a circuit court's findings of fact unless they are clearly erroneous. ***Waukesha Cnty. v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783 (involuntary commitment); ***Outagamie Cnty. v. Melanie L.***, 2013 WI 67, ¶¶37-38, 349 Wis. 2d 148, 833 N.W.2d 607 (involuntary medication and treatment).   However, whether those facts fulfill the statutory requirements in WIS. STAT. ch. 51 presents issues of law that this court reviews de novo. ***J.W.J.***, 375 Wis. 2d 542, ¶15; ***Melanie L.***, 349 Wis. 2d 148, ¶¶38-39.

#### B.      Substantive Legal Standards

*Recommitment*

¶22      Circuit courts have authority to extend involuntary commitments under WIS. STAT. § 51.20(13)(g).   In considering a petition for extension, courts apply the criteria set forth in § 51.20(1)(a).   A court may order the initial commitment of an individual if the petitioner shows, by clear and convincing evidence, that the individual meets a three-prong standard by being:  (1) mentally ill;  (2) a  proper  subject  for  treatment;  and  (3) currently  dangerous. Sec. 51.20(1)(a)1., 2.a.-e., and (13)(e); ***J.W.K.***, 386 Wis. 2d 672, ¶¶17, 24.

¶23      Under the third prong, addressing current dangerousness, WIS. STAT. § 51.20(1)(a)2.a.-e. sets forth five separate standards, each of which includes a requirement of recent acts or omissions demonstrating that the individual is a danger to himself or herself or others. ***J.W.K.***, 386 Wis. 2d 672, ¶17.

¶24    If a person is subject to a WIS. STAT. ch. 51 commitment order, a petitioner such as Rock County here may, before the expiration of the prior commitment, petition for an extension of that commitment under WIS. STAT. § 51.20(13)(g)3.  *See J.W.K.*, 386 Wis. 2d 672, ¶18.  Extension may be for up to one year.  Sec. 51.20(13).  The petitioner pursuing recommitment must prove by clear and convincing evidence that the individual is:  (1) mentally ill, (2) a proper subject for treatment, and (3) dangerous.  *See* § 51.20(1)(a) and (am), and (13)(e) and (g)3.; *J.W.K.*, 386 Wis. 2d 672, ¶¶18, 24.  This may be accomplished by showing that the individual is dangerous under § 51.20(1)(am).  *See J.W.K.*, 386 Wis. 2d 672, ¶19 (observing that § 51.20(1)(am) "provides a different avenue for proving dangerousness").

¶25    As pertinent here, WISCONSIN STAT. § 51.20(1)(am) provides:

> [I]f the individual has been the subject of outpatient treatment for mental illness, … immediately prior to commencement of the proceedings as a result of a commitment ordered by a court under this section, the requirements of a recent overt act, attempt or threat to act under par. (a)2. a. or b., pattern of recent acts or omissions under par. (a)2. c. or e., or recent behavior under par. (a)2. d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

Our supreme court has explained that § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *J.W.K.*, 386 Wis. 2d 672, ¶19.  Thus, § 51.20(1)(am) "functions as an alternative evidentiary path" for showing dangerousness, "reflecting a change in circumstances occasioned by an individual's commitment

11

and treatment" and "acknowledg[ing] that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e." *J.W.K.*, 386 Wis. 2d 672, ¶¶19, 24.

¶26 Nevertheless, dangerousness must be proven to support the extension of an involuntary commitment, with reference to the specific dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *J.W.K.*, 386 Wis. 2d 672, ¶19; *see also D.J.W.*, 391 Wis. 2d 231, ¶34. The fourth dangerousness standard is pertinent here. A person is dangerous within the meaning of § 51.20(1)(a)2.d. if the individual is unable "to satisfy basic needs for nourishment, medical care, shelter or safety," causing "a substantial probability" of imminent "death, serious physical injury, serious physical debilitation, or serious physical disease." Sec. 51.20(1)(a)2.d.

¶27 In sum, then, the County here had to prove that J.J.K. was dangerous, but it did not need to show recent behaviors exhibiting dangerousness outlined in WIS. STAT. § 51.20(1)(a)2.d., so long as it could prove a substantial likelihood that he would be a proper subject for commitment if treatment were withdrawn based on the fourth standard. *See D.J.W.*, 391 Wis. 2d 231, ¶¶33-34.

*Involuntary Medication And Treatment*

¶28 There is "a presumption of competence to choose" to take or refuse medication, "regardless of commitment status" of the person. *Melanie L.*, 349 Wis. 2d 148, ¶45. I apply that presumption in the context of the following statutory language establishing what a petitioner must show to obtain an order for involuntary medication and treatment under the circumstances here:

> 4. … [A]n individual is not competent to refuse medication or treatment if, because of mental illness, … and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:
>
> > **a.** The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
> >
> > **b**. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication or treatment.

WIS. STAT. § 51.61(1)(g)4.a.-b. The petitioner bears the burden of proving that one of the above conditions is met by clear and convincing evidence. *Melanie L.*, 349 Wis. 2d 148, ¶¶37, 55.

## C. Analysis

### *Recommitment*

¶29 J.J.K. does not argue that the County failed to meet its burden of showing that he is mentally ill or that he is a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1. Instead, he argues that the testimony and reports of the two experts did not constitute clear and convincing evidence that J.J.K. is currently dangerous on the ground offered by the experts, which is that, as seen through the evidentiary lens permitted under § 51.20(1)(am), J.J.K. will stop taking his psychotropic medication and then become unable "to satisfy basic needs for nourishment, medical care, shelter or safety," causing "a substantial probability" of imminent "death, serious physical injury, serious physical debilitation, or serious physical disease." *See* § 51.20(1)(a)2.d. I disagree that the evidence is sufficient to meet the legal standards.

¶30    The County does not dispute J.J.K.'s position that "substantial probability" here means "much more likely than not." *See Marathon Cnty. v. D.K.*, 2020 WI 8, ¶¶35-42, 390 Wis. 2d 50, 937 N.W.2d 901. However, J.J.K. fails to explain why Dr. Marcus's testimony and report (as corroborated in some respects by evidence from Dr. Black) did not meet this standard by clear and convincing evidence, given the unrebutted testimony that J.J.K. unambiguously told both experts that he would stop taking his medication if not required to do so and additional evidence that includes the following.

¶31    As summarized above, Dr. Marcus reported that, if J.J.K. were to stop taking his medication, there was "a substantial likelihood of psychotic decompensation," which "would result in an increased risk of dangerousness, primarily to self." Dr. Marcus went on to identify in his report the "specific concern" that J.J.K.'s judgment "would be grossly impaired" and that his "ability to satisfy his *basic care needs*" would "decline." "Basic care needs" appears to refer to the essentials of life, not just to "needs" in the sense of desires or wants, or involving the achievement of stereotypically comfortable living circumstances. This intended meaning was confirmed by Dr. Marcus when the court asked him to elaborate on these statements in his report.

¶32    In elaborating, Dr. Marcus testified that "[o]ne of the most concerning aspects" about J.J.K.'s circumstances at the time of his initial commitment, when he was not on the medication,

> was his residing outdoors in very cold weather and so lack of judgment and an inability to satisfy issues of shelter, issues of nutrition. There was concern that he was paranoid about food and was not accepting of that. There were basic care needs concerns which were raised in the record.

14

A reasonable interpretation of this evidence is that Dr. Marcus concretely provided a link between past significant dangerous-to-self behavior by J.J.K. and a substantial likelihood of recurrence of such behavior absent an extension order. More to the point, this record is sufficient to support a determination that J.J.K. would repeat the dangerous cycle if allowed to stop taking the medications.

¶33    J.J.K. suggests that the circuit court clearly erred in its interpretation of the expert testimony.  J.J.K. argues that neither expert "testified that [that expert] believed J.J.K. would abandon his apartment and resume living outdoors if treatment were withdrawn."  Both experts could have been more explicit and expansive in predicting the timing and circumstances of the self-harm that they foresaw resulting from psychotic decompensation.  But I reject the argument that Dr. Marcus failed to convey in his report and testimony the opinion that there would be, in his words, "a substantial likelihood of psychotic decompensation," leading to serious, imminent self-harm involving exposure to the elements and lack of basic nutrition.

¶34    I turn to the legal issue of whether this evidence satisfies the WIS. STAT. § 51.20(1)(am)'s "dangerousness" requirement.  There could be no reasonable argument, and J.J.K. does not attempt to make such an argument, that as a general matter living outdoors (even on days and nights in Wisconsin when the weather is *not* at its most inclement), when one has "an inability to satisfy issues of shelter" and "nutrition"—including failing to consume food based on mental illness—would not pose "a substantial probability" of imminent "death, serious physical injury, serious physical debilitation, or serious physical disease."

¶35    Instead, J.J.K. points out that the "[i]nability to care for oneself does not equate with a 'substantial probability' that 'death, serious physical injury,

serious physical debilitation, or serious physical disease' would ensue if treatment were withdrawn." *See **D.J.W.**,* 391 Wis. 2d 231, ¶53. This is also an accurate statement of the law. But the facts here differ markedly from those in ***D.J.W.*** In that case, the only evidence of dangerousness were concerns that D.J.W. would be unable to care for himself in ways that would result in him losing a job, forcing him to rely on disability for income, and requiring him to continue to live with family. *See **id**.,* ¶51. Here, in contrast, Dr. Marcus's testimony was not merely that, once off the medication, J.J.K. would have a somewhat reduced ability to care for himself, perhaps in such relative innocuous areas as worsened hygiene or less-than-optimal nutrition. Instead, given the history, the evidence as a whole could be reasonably interpreted as a prediction that J.J.K.'s mental illness would cause him to again expose himself to serious physical harm through extreme exposure to the elements and malnourishment.

¶36　J.J.K. also points out that "[i]t is not enough that the individual was at one point a proper subject for commitment. The County must prove the individual 'is dangerous.'" *See **J.W.K.**,* 386 Wis. 2d 672, ¶24 (quoted source and emphasis omitted). This is an accurate statement of the law. But the testimony here was not merely that J.J.K. once was at risk of serious physical injury through exposure and malnutrition; the evidence from the experts as a whole could reasonably be interpreted to stand for the proposition that he would be at that same risk as a consequence of refusing medication, as he says he will absent a court order.

¶37　J.J.K. emphasizes the testimony of the experts that, while consistently medicated and notably improved by the time of the recommitment hearing, J.J.K. expresses relative contentment with his current independent living in an apartment, and suggests that this must mean that the predictions of Dr.

Marcus that an un-medicated J.J.K. would revert to highly dangerous outdoor living cannot be credited. This argument ignores the effect of WIS. STAT. § 51.20(1)(am), which allows the courts to consider testimony that a person is in fact currently dangerous based on a link between demonstrated prior dangerous behavior and the dangerous behavior that would ensue when treatment is terminated.

¶38 My analysis follows the reasoning in *Winnebago County v. S.H.*, 2020 WI App 46, 393 Wis. 2d 511, 947 N.W.2d 761, which I am obligated to follow as a published opinion of this court following conversion of the case from one-judge to three-judge status. In concluding that the petitioner in *S.H.* met its burden of proving the committed person to be dangerous under WIS. STAT. § 51.20(1)(am), the court observed that "[d]angerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter)," all of which "involve[ ] a fact-intensive weighing of the evidence so as to arrive at an educated conclusion as to the likelihood of reoccurring dangerousness." *S.H.*, 393 Wis. 2d 511, ¶13 & n.6.

¶39 J.J.K. argues for the first time in his reply brief on appeal that the recommitment order must be reversed because the circuit court failed to provide "specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based," as required in *D.J.W.*, 391 Wis. 2d 231, ¶¶3, 43. The argument is that the circuit court "did not mention" the fourth standard (§ 51.20(1)(a)2.d.) "anywhere in its findings or order, and only specifically references the fifth standard, WIS. STAT. § 51.20(1)(a)2.e."

17

¶40    The first problem with this argument is timing; the County lacks a fair opportunity to address it.[6]  *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("It is inherently unfair for an appellant to withhold an argument from its main brief and argue it in its reply brief because such conduct would prevent any response from the opposing party.").  I reject it on that basis.  It would be unfair to the County to reverse based on this new argument in the reply brief.

¶41    I also observe that the record reflects that the circuit court was contemplating the applicable fourth standard, and simply misspoke in referring to "the fifth standard."  *See* WIS. STAT. § 51.20(1)(a)2.d., e.  It would have made no sense for the court to have talked about J.J.K. not being "able to care for himself and suffer [from failure to meet] his basic needs," including his needs "for nourishment," "medical care," "shelter[]," and "safety," in connection with the fifth standard.  Further, as noted above, the County's argument was clearly based on a combination of § 51.20(1)(a)2.d. and § 51.20(1)(am), and the court's decision immediately followed arguments by both sides.  Ideally, counsel for both sides would have assisted the circuit court by calling to its attention this misstatement, but neither did.  In any case, any error was surely harmless.  I do not interpret *D.J.W.*, 391 Wis. 2d 231, ¶¶3, 43, to put form over substance in a manner that would require reversal on this record.  Because it is obvious that the only standard to which the circuit court here was referring was the fourth standard, there is no

---

[6] J.J.K. states in his opening appellate brief that the circuit court referenced "the fifth standard" in explaining its decision, but this does not constitute the argument that appears in the reply brief that, in itself, this is a basis for reversal.  Instead, the challenge to recommitment in the opening brief is based exclusively on allegedly insufficient evidence.

risk here of the "guesswork" on appeal that our supreme court sought to avoid by instituting the new requirement for specific factual findings. ***Id.***, ¶45.

*Involuntary Medication And Treatment*

¶42    J.J.K. argues that the County failed to overcome the presumption that he was competent to refuse medication with clear and convincing evidence that satisfies WIS. STAT. § 51.61(1)(g)4.a.-b., quoted above. As he correctly points out, this involves the "'significant liberty interest in avoiding forced medication of psychotropic drugs.'" ***Melanie L.***, 349 Wis. 2d 148, ¶43 (quoted source omitted).

¶43    The experts here granted that J.J.K. was "[]capable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives," and therefore WIS. STAT. § 51.61(1)(g)4.a. is off the table. However, I conclude that the County presented sufficient proof that J.J.K. was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication or treatment," *see* § 51.61(1)(g)4.b. The County overcame the presumption that J.J.K. was competent to make an informed choice to refuse medication.

¶44    As summarized above, Dr. Marcus testified that J.J.K. was not able to apply an understanding of the advantages and disadvantages of the medication to his situation, because he "did not believe he had a treatable mental illness which would require this type of medication." That is, according to Dr. Marcus, J.J.K.'s incapacity on this topic arises largely from his misunderstanding that the medication could do him no good; he could not weigh the advantages and disadvantages of medication because he fails to recognize what Dr. Marcus testified was "fairly significant[]" therapeutic value for him. J.J.K. fails even to

No.  2020AP2105

attempt to come to grips with this testimony, and therefore implicitly concedes that J.J.K. could not recognize any advantage of medication.

¶45  J.J.K.'s argument on this topic is entirely based on the premise that there was insufficient evidence that anyone explained to J.J.K. other treatment alternatives besides psychotropic medications.  This argument is based on the requirement that "it is the responsibility of medical experts who appear as witnesses for the county to explain how they probed the issue of whether the person can 'apply' his or her understanding to his or her own mental condition." *See Melanie L.*, 349 Wis. 2d 148, ¶75.

¶46  As summarized above, Dr. Marcus testified that he explained to J.J.K. that the medication would treat his paranoia and reduce agitation and lability and that it would cause "sedation, abnormal muscle movements, weight gain, metabolic disturbance, pain at the injection site," and restlessness.  Dr. Marcus also "[v]ery briefly mentioned" to J.J.K. "that other psychotropic medications, either oral or injectable, can sometimes be used and that other interventions like therapy and case management services can be provided."

¶47  There was no cross examination of either Dr. Marcus or Dr. Black, or other evidence, that could undermine the determination that Dr. Marcus sufficiently conveyed in his testimony that he engaged with J.J.K. in a meaningful discussion of alternative modes of treatment and their advantages and disadvantages.  The requirement that experts explain "how they probed the issue of whether the person can 'apply' his or her understanding to his or her own mental condition," as required in *Melanie L.*, was largely satisfied by the unambiguous testimony about how they discussed with J.J.K. his mental illness and how he fails to recognize that he is mentally ill and that the medication

20

benefits him, even to a small degree, contrary to the facts. *See id.* His fundamental misunderstanding makes it impossible for him to make an informed choice. Our supreme court has recognized that "[i]t may be true that if a person cannot recognize that he or she has a mental illness, logically, the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness." *Id.*, ¶72.

¶48 I conclude that the testimony and reports of the two experts here are sufficient. Beyond that evidence, it supports my conclusion regarding J.J.K.'s awareness of alternatives that Dr. Marcus's report reflects that he was receiving services from both an outpatient psychiatrist and a case manager. Consistent with this, Dr. Black testified that J.J.K. had "case management" and "community-based contacts."

## CONCLUSION

¶49 For all these reasons, I affirm the recommitment and involuntary medication and treatment orders.

*By the Court*.—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.