**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 12, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP912**

Cir. Ct. No. 2020ME75

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

IN THE MATTER OF THE MENTAL COMMITMENT OF R.K.M.:

SAUK COUNTY DEPARTMENT OF HUMAN SERVICES,

   PETITIONER-RESPONDENT,

 V.

R.K.M.,

   RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Sauk County: PATRICIA A. BARRETT, Judge. *Affirmed.*

¶1      BLANCHARD, J.[1]  R.K.M. appeals a circuit court order extending his involuntary commitment under WIS. STAT. ch. 51.  R.K.M. argues that the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

order must be reversed because the County failed to introduce sufficient evidence that he was dangerous. I reject R.K.M.'s arguments and affirm.

## BACKGROUND

¶2 It is undisputed for the purposes of this appeal that R.K.M. is mentally ill; specifically, that he has paranoid schizophrenia. In November 2020, R.K.M. was involuntarily committed by stipulated order. Throughout the next two years, R.K.M. stipulated to extensions of his commitment, and he also stipulated to involuntary medication and treatment orders.

¶3 In October 2022, the County sought to extend R.K.M.'s commitment, but did not seek another involuntary medication and treatment order. R.K.M. challenged the recommitment.[2]

¶4 At the recommitment hearing, the County elicited testimony from R.K.M.'s case manager Stuart Adler and a psychiatrist, Dr. Leslie Taylor. The County also moved into evidence Taylor's examiner's report without objection.

¶5 Dr. Taylor reported the following. R.K.M. was hospitalized in July 2020 and failed to follow treatment recommendations or take prescribed medication following that hospitalization. R.K.M. was hospitalized again in the fall of 2020 and "refused medication." In February 2021, R.K.M. was hospitalized because he was experiencing auditory and visual hallucinations. At that time, R.K.M. admitted he had not taken his medications and that he had

---

[2] WISCONSIN STAT. § 51.20, as well as courts discussing it, uses the terms "recommitment" and "extension of a commitment" interchangeably. *See* **Portage Cnty. v. J.W.K.**, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509.

recently overdosed on a medication. In March 2021, R.K.M. "threatened to hurt staff" and refused medication until he was reminded that he was required to take medication by court order. R.K.M. "has heard voices telling him to kill himself."

¶6 At the recommitment hearing, Dr. Taylor testified in pertinent part to the following. She examined R.K.M. on two occasions, most recently in April 2022 (seven months prior to the recommitment hearing). However, R.K.M. refused to meet with Taylor in connection with the current recommitment proceedings. Taylor based her opinions on her previous interviews with R.K.M., as well as a review of collateral resources. These sources included doctor notes and discussions with R.K.M.'s case manager, Adler. R.K.M. does not believe he has a mental illness and does not believe that he needs medication. He has heard "voices, what we call command hallucinations, that have told him to harm himself," and "he has actually harmed himself in the past in response to those voices." There was a substantial likelihood that R.K.M. would become a proper subject for commitment if treatment were withdrawn. If R.K.M. were not subject to a commitment, he would stop taking his medication and "decompensate," experiencing a "recurrence of his symptoms." "[H]istorically when [R.K.M.]'s been off of medication, he has become more paranoid, and then he's engaged in suicidal behaviors [and] had an overdose attempt."

¶7 R.K.M.'s case manager Adler testified in pertinent part to the following. R.K.M. recently moved to a residential care apartment complex where he was granted increased independence. R.K.M. was able to come and go freely from the facility, prepare his own meals, and maintain his own living space. R.K.M. had been seeing his treating psychiatrist regularly. R.K.M. told Adler that R.K.M. would still take his medications even if he were no longer subject to a commitment. Nevertheless, Adler expressed "concern[]" that R.K.M. would stop

taking his medications and decompensate absent a commitment. R.K.M. had missed a "couple" of doses of medication during a recent period in which R.K.M. was visiting his mother and failed to return to the facility to pick up his medication. In one incident on March 2, 2022, a medication that R.K.M. had been prescribed was giving him bad dreams. R.K.M. discussed this medication with his treating psychiatrist, and this medication was discontinued. Then, on March 8 and 9, 2022, R.K.M. was "hesitant about taking" his medications, but facility staff discussed the situation with R.K.M., and "they were able to convince [R.K.M.] to take the medications."

¶8      The circuit court granted the County's recommitment petition and ordered that R.K.M. be recommitted for a period of 12 months. The court said that R.K.M. had "made a great deal of progress," but expressed concerns about medication compliance. The court said that there was a period of "four days" during which R.K.M. missed his medications. The court said that there was "dangerousness here historically and even very recently," and determined that R.K.M. is "a danger to himself under all of the facts and circumstances."

## DISCUSSION

¶9      To prevail in a WIS. STAT. ch. 51 recommitment proceeding, a petitioner (here, the County) must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of five statutory dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e). The pertinent standard in this case is the first dangerousness standard, which requires proof that the individual "[e]vidences a substantial probability of physical harm to himself or

4

herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." Sec. 51.20(1)(a)2.a.[3]

¶10    In an initial commitment proceeding, the petitioner must prove dangerousness by reference to "recent acts or omissions." *J.W.K.*, 386 Wis. 2d 672, ¶17; *see also* WIS. STAT. § 51.20(1)(a)2.   In recommitment proceedings, however, the petitioner is not required to identify recent acts or omissions; instead, the petitioner may rely on § 51.20(1)(am), which provides that the petitioner may satisfy its burden "by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."  This provision "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *J.W.K.*, 386 Wis. 2d 672, ¶19.

¶11    "Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter)." *Winnebago Cnty. v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761.   At the same time, however, "reliance on assumptions concerning a recommitment at some unidentified point in the past, and conclusory opinions parroting the statutory language without actually

---

[3] The County also argued in the circuit court that R.K.M. was dangerous under the second statutory dangerousness standard, which requires proof of "a substantial probability of physical harm to other individuals." WIS. STAT. § 51.20(1)(a)2.b.  The circuit court determined that the County did not prove dangerousness under the second standard, and the County does not challenge that ruling.  Thus, only the first standard is at issue in this appeal.

discussing dangerousness, are insufficient to prove dangerousness in an extension hearing." *Id.*, ¶17.

¶12 Whether the County presented clear and convincing evidence to prove dangerousness is a mixed question of fact and law. *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶¶23-24, 391 Wis. 2d 231, 942 N.W.2d 277. The circuit court's factual findings are upheld unless "clearly erroneous," and whether the facts satisfy the statutory dangerousness standard is a question of law reviewed de novo. *Id.*

¶13 R.K.M. acknowledges that the County relies on WIS. STAT. § 51.20(1)(am), and that its theory of dangerousness is based not on recent acts but on the risk of "decompensation"—that is, the risk that, absent the commitment, R.K.M. would cease taking medication and experience a recurrence of the symptoms that previously made him a danger to himself. Aspects of R.K.M.'s arguments on appeal are not easy to track, but he asserts that the County failed to prove that R.K.M. is currently dangerous because it failed to show a "link between past dangerousness and the likelihood of its recurrence." R.K.M. acknowledges that Dr. Taylor and Adler both opined that R.K.M. would cease taking his medication and decompensate absent a commitment, but he argues that these opinions are conclusory and lack evidentiary support.[4] That is, R.K.M.'s sufficiency argument boils down to challenges to the substance of each witness's testimony, which I now address and reject.

---

[4] The parties' briefs also address the issue of whether R.K.M.'s refusal to meet with Dr. Taylor made it impossible for the County to seek an involuntary medication and treatment order. I do not address this issue because it is not pertinent to the sole issue on appeal, which is whether the County presented sufficient evidence to prove dangerousness as necessary to justify a recommitment order.

### A. Dr. Taylor's Opinion

¶14 To repeat, Dr. Taylor testified that R.K.M. does not believe he has a mental illness and that, when R.K.M. has "been off of medication, he has become more paranoid, and then he's engaged in suicidal behaviors [and] had an overdose attempt." Taylor's October 2022 report recounts multiple incidents in 2020 and 2021 in which R.K.M. was hospitalized and refused medication. Taylor opined that if R.K.M. were not subject to a commitment, he would stop taking his medication and "decompensate," experiencing a recurrence of his symptoms.

¶15 R.K.M. argues that Dr. Taylor's opinion that R.K.M. would cease taking medication absent a commitment is undermined by the expert report that she submitted in 2020 in support of R.K.M.'s initial commitment. The 2020 report describes a time when R.K.M.'s insurance lapsed, causing "an interruption of approximately one month" during which R.K.M. "was not taking medication." According to R.K.M., the 2020 report shows Taylor's opinion that R.K.M. would refuse medication to be baseless and that, to the contrary, R.K.M. failed to take his medication only because his insurance coverage for the medication ran out. This argument fails for at least two reasons.

¶16 First, the 2020 report was never introduced or even discussed at the recommitment hearing. Arguments not made before the circuit court are forfeited, and I generally do not address forfeited arguments. *See City of Madison v. DHS*, 2017 WI App 25, ¶20, 375 Wis. 2d 203, 895 N.W.2d 844. If R.K.M. wished to use the report to undermine aspects of Dr. Taylor's testimony, the time to have done so would have been at the recommitment hearing. I deem R.K.M.'s

argument based on the 2020 report to be forfeited, and I discern no reason to overlook this forfeiture.[5]

¶17    Second, R.K.M.'s argument fails because, contrary to R.K.M.'s argument, the 2020 report does not undermine Dr. Taylor's opinion.  The 2020 report cites a single period during which R.K.M. did not take his medication due to a lapse of insurance.  However, Taylor's October 2022 examiner's report (which was admitted into evidence at the recommitment hearing) refers to other occasions in 2020 and 2021 when R.K.M. failed to take prescribed medication, not because of insurance issues, but because R.K.M. refused to take the medication.  R.K.M. fails to explain why the circuit court could not reasonably credit Taylor's reliance on this history of medication refusal in forming her opinion that R.K.M. would cease taking his medication absent a commitment.

¶18    R.K.M. also argues that Dr. Taylor's opinion lacks an evidentiary basis because, although she testified that R.K.M. said that he did not want to take medication, Taylor later "corrected" her testimony by saying that R.K.M. said that he "did not feel he had a mental illness."  However, Taylor did not say that she was "correcting" erroneous prior testimony when she offered this later testimony.  In context, Taylor's testimony appears to be that R.K.M. had previously said *both*

---

[5] In his reply brief, R.K.M. makes another similar argument, attempting to undermine Dr. Taylor's testimony by way of a September 2021 examiner's report filed in connection with previous recommitment proceedings in this case.  Again, this prior report was not introduced or discussed at the recommitment hearing.  I deem R.K.M.'s argument about the September 2021 report to be forfeited, and I decline to address this forfeited argument.  I reject this argument for the additional reason that it comes for the first time in R.K.M.'s reply brief.  *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (arguments made for the first time in a reply brief are unfair to the respondent and need not be addressed).

that he did not want to take his medication and that he did not believe he had a mental illness.

¶19    For these reasons, I reject R.K.M.'s arguments that Taylor's opinion is conclusory and lacks evidentiary basis.[6]

### B. Adler's Opinion

¶20    To repeat, R.K.M.'s case manager Adler opined that R.K.M. would stop taking his medication if he were no longer subject to his commitment. R.K.M. argues that this opinion lacks evidentiary basis for two reasons.

¶21    R.K.M. argues that Adler's opinion was "inexplicable" in light of R.K.M.'s "most recent behavior."  R.K.M. does not specify what "recent behavior" he is referring to, but presumably this refers to evidence that, fortunately, R.K.M. has generally improved since his initial commitment in 2020. To be sure, there was evidence of recent improvement, including evidence that R.K.M. was able to live more independently, that R.K.M. saw his treating psychiatrist regularly, and that R.K.M. had been proactive in discussing the side effects of a particular medication with his treating psychiatrist.  However, the County also introduced evidence of R.K.M.'s recent issues with medication compliance, including testimony that R.K.M. had recently missed doses, and testimony that, around March 8, 2022, R.K.M. was "hesitant about taking" medications, and staff had to convince R.K.M. to do so.  The County also

---

[6] R.K.M. also challenges Dr. Taylor's opinion on the ground that her opinion is based in part on her discussions with case manager Adler and specifically on Adler's concerns about R.K.M.'s medication compliance, which, according to R.K.M., lack foundation.  I reject this argument for at least the reason that, as explained below, I reject R.K.M.'s arguments challenging Adler's opinion.

introduced unrefuted testimony by Dr. Taylor that R.K.M. lacks insight into his condition and does not believe that he has a mental illness, as well as evidence of incidents in 2020 and 2021 in which R.K.M. was hospitalized and refused to take medications. R.K.M. fails to direct me to any part of the record showing that it was unreasonable for Adler to continue to have concerns about R.K.M.'s medication compliance despite some recent improvement by R.K.M.

¶22 R.K.M. also argues that Adler's opinion was inexplicable in light of R.K.M.'s recent statement that R.K.M. would take his medication regardless of whether he were subject to a commitment. However, R.K.M. does not explain why Adler was required to take R.K.M. at his word, and in context, I conclude that there was an ample basis in the record for the circuit court to reasonably infer that Adler was skeptical of R.K.M.'s statement on this point. As explained above, the County introduced recent and historic evidence of R.K.M.'s medication compliance issues and lack of insight into his mental illness. R.K.M.'s representation that he would continue to take his medication regardless of whether he was subject to a commitment does not render unreasonable the court's reliance on Adler's opinion to the contrary.

¶23 R.K.M. also challenges a finding by the circuit court based on Adler's testimony, namely, that R.K.M. missed four doses of medication. R.K.M. correctly notes that Adler's testimony was instead that R.K.M. missed a "couple" of doses. However, R.K.M. does not explain why this difference matters. Even two missed doses would support the court's stated concerns about R.K.M.'s medication compliance, when considered in the context of the other evidence offered on this issue.

¶24     For these reasons, I reject R.K.M.'s argument that Adler's opinion is conclusory and lacks evidentiary basis.

¶25     Having rejected R.K.M.'s arguments, I conclude that R.K.M. has not shown that the County failed to introduce clear and convincing evidence that R.K.M. was dangerous to himself under the first statutory dangerousness standard.

## CONCLUSION

¶26     For all of these reasons, the order of the circuit court extending R.K.M.'s commitment is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)4.